518 F.2d 743
 UNITED STATES of America, Plaintiff-Appellee,
v.
ARTICLES OF FOOD AND DRUG CONSISTING OF COLI-TROL 80, F4C-60
FEED GRADE, ENTROL-S MEDICATED, ENTROL-P, etc., Defendant,
Naremco, Inc., Movant-Appellant.
 No. 74-2059.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 8, 1975.
 
 O. J. Taylor, Springfield, Mo., R. Wilson Smith, Jr., Gainesville, Ga., for movant-appellant.
 John W. Stokes, Jr., U. S. Atty., Beverly B. Bates, Asst. U. S. Atty., Atlanta, Ga., Alan R. Bennett, Rockville, Md., Jay H. Geller, Los Angeles, Cal., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Georgia.
 Before GODBOLD, Circuit Judge, SKELTON, Associate Judge,* and GEE, Circuit Judge.
 GODBOLD, Circuit Judge:
 
 
 1
 The United States seized and seeks to condemn under § 304 of the Food and Drug Act of 1938, as amended, 21 U.S.C. § 334, quantities of four animal drugs and an animal food containing a food additive. The drugs and the food additive were all manufactured by the appellant. The drugs and the food containing the food additive were seized because they were believed to be adulterated within the precise meaning of that term as used in the Act, 21 U.S.C. §§ 342(a)(2)(C) and 351(a)(5). Also one drug was believed to be misbranded within the meaning of 21 U.S.C. § 352(a).
 
 
 2
 The District Court held that all four drugs and the food were adulterated and that one drug was misbranded within the terms of the applicable statutes. It therefore ordered the items condemned and destroyed pursuant to 21 U.S.C. § 334(e).
 
 
 3
 Stated somewhat baldly, the federal food and drug laws prohibit from interstate commerce drugs which are not safe and effective for their intended use, and food additives which are not safe for their intended use. This policy is effectuated by requiring the approval of the Secretary of Health, Education and Welfare of any new drug or any food additive prior to its shipment in interstate commerce. One seeking to introduce a new animal drug into interstate commerce must secure from the Secretary approval of a new animal drug application for that drug under 21 U.S.C. §§ 355(b)-(d).[1] One seeking to introduce a food additive into interstate commerce must do so pursuant to a regulation formulated under 21 U.S.C. §§ 348(b) and (c).[2]
 
 
 4
 The touchstone of both paths of regulation is safety and, for drugs, effectiveness as well. Section 355(d) requires the Secretary to refuse approval of a new drug application when he finds "that . . . (2) the results of such tests (submitted by the drug's proponent) do not show that such drug is safe for use . . . (or) (5) evaluated on the basis of the information submitted . . . there is lack of substantial evidence that the drug will have the effect it purports or is represented to have . . . ." Similarly, § 348(c) (3)(A) requires the Secretary not to issue a food additive regulation where the data submitted "fails to establish that the proposed use of the food additive, under the conditions of use to be specified in the regulation, will be safe . . ."[3] Thus in either case those who seek to market a drug or food additive in interstate commerce have some burden of proving the safety and, for drugs, the effectiveness of their product. See Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 613, 617-618, 93 S.Ct. 2469, 2476-2478, 37 L.Ed.2d 207, 214, 216-217 (1973).
 
 
 5
 The alternative route for drug or food additive manufacturers is to market their products without approval and to let the Secretary take the initiative, as here. The test then is a different one, going to "general recognition" of safety or effectiveness rather than actual safety or effectiveness.[4] This is the route selected by the manufacturer in the case before us.
 
 
 6
 In the new animal drug application context the effectiveness evidence which the manufacturer must bring forward includes "adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved" from which such experts could reasonably conclude that the drug would be effective as claimed, § 355(d); Weinberger v. Hynson, Westcott & Dunning, supra, 412 U.S. at 617, 93 S.Ct. at 2477, 37 L.Ed.2d at 216.
 
 
 7
 The crux of appellant's argument on appeal is that the test for general recognition of safety and effectiveness to determine whether an animal drug is a new animal drug and whether a substance is a food additive is not to be based on the same kind of scientific evidence that is required for testing safety and efficacy of drugs and additives for new animal drug applications and food additive regulations, §§ 348(b)-(d) and 355(b)-(h) and 21 C.F.R. § 130.12. This is because drugs "used in medicine since long before science reached the point of engaging in 'adequate and well-controlled investigations' " had passed tests of safety and efficacy by trial and error. The Supreme Court has already rejected this view in a dictum in Weinberger v. Hynson, Westcott & Dunning, supra. The Court quoted with approval an argument of the Solicitor General that drugs on the market "will have mustered the requisite scientifically reliable evidence of effectiveness long before they are in a position to drop out of active regulation by ceasing to be a 'new drug,' " 412 U.S. at 631, 93 S.Ct. at 2484, 37 L.Ed.2d at 224. In a companion case decided the same day the Court restated this and said that "the reach of scientific inquiry under both § 505(d) (21 U.S.C. § 355(d), supra ) and § 201(p) (21 U.S.C. § 321(p)) is precisely the same," Weinberger v. Bentex Pharmaceuticals, Inc., 412 U.S. 645, 652, 93 S.Ct. 2488, 2493, 37 L.Ed.2d 235, 241 (1973). The pertinent provisions here in question of § 321(w), which defines new animal drugs, are identical to § 321(p), which defines new drugs except new animal drugs.
 
 
 8
 Just prior to this observation the Court carved out a limited but indefinite exception. It said, "It may, of course, be true that in some cases general recognition that a drug is efficacious might be made without the kind of scientific support necessary to obtain approval of an NDA (new drug application)," id. The three drugs and the food additive challenged in this case are potentially within that exception since they all have as their active ingredient gentian violet, a drug long used and well recognized as a safe and effective fungicide and bactericide in man. The District Court so found, 372 F.Supp. at 918. But new combinations of well-known drugs constitute new drugs for purposes of the Act exactly because the effects of drugs in combinations are often not the sum of their parts. If reliance on a single well-known active ingredient like gentian violet lowers the test for general recognition of efficacy and safety (as appellant argues it should and as the Court hinted it might in Bentex Pharmaceuticals ), it does not lower it to the level necessary on the facts of this case to change the result.
 
 
 9
 The United States need only show the lack of the proper reputation for safety and efficacy of the drugs and for safety of the food additive among the appropriate experts, or that what reputation there is, is not based on adequate studies. It is not enough to show merely a conflict in the evidence of general recognition, for even properly conducted studies may produce disagreement. What is required is not unanimous recognition but general recognition.
 
 
 10
 In the case before us, the United States has shown that there are no reports of in vivos tests published in recognized scholarly journals concerning the effectiveness of the drugs or the safety of the food additive, no professionally informed opinions of disinterested qualified research veterinarians or pathologists as to these products' safety or effectiveness based on adequate, controlled studies of the effectiveness of the drugs or the safety of the drugs or food and, indeed, no completed adequate studies of any kind on any of these products. 372 F.Supp. at 919. This showing not only establishes that there is not general recognition but that there is no recognition of the safety or effectiveness of these products at all.
 
 
 11
 Even allowing for the general recognition accorded gentian violet, as suggested by the dictum in Bentex Pharmaceuticals, supra, we think the District Court could not hold that these combinations including gentian violet are generally recognized as safe or effective in the absence of any adequate, well-controlled, completed test of the safety or efficacy of any of the combinations here challenged.
 
 
 12
 The trial court's opinion suggests that any conflict in the expert testimony is sufficient to prove the lack of a general reputation for safety or effectiveness. 372 F.Supp. at 920-921. So broad a statement of the rule is not necessary to this case where there was in fact no bona fide conflict among experts with each side basing its conclusions on adequate, well-controlled studies, and we do not pass on its correctness. The government's witnesses testified that they knew of no studies upon which any expert opinion could be based. The manufacturer responded with irrelevant or incomplete studies, expert opinions based on these tests or clinical experience (as opposed to clinical studies), and the interested opinions of commission salesmen. Whatever test is applied, the United States showed that there is no recognition of these products for safety or effectiveness.
 
 
 13
 As to the misbranded drug, the question is solely whether the court's finding of fact was clearly erroneous. The evidence here was similar to that in the other issues of this case, and the court's conclusion was not clearly erroneous.
 
 
 14
 Affirmed.
 
 
 
 *
 Of the U. S. Court of Claims, sitting by designation
 
 
 [1]
 Although enforcement is straightforward enough, the trip through the statute is not. Failure to have approval of a new drug application renders the drug unsafe for purposes of § 360b(a)(1)(A). A drug that is unsafe under § 360b(a)(1)(A) is adulterated for purposes of § 351(a)(5). A drug that is adulterated is subject to seizure under § 334(a)(1)
 A drug is misbranded if, among other things, its label is "false or misleading in any particular," § 352(a). A drug that is misbranded is subject to seizure under § 334(a)(1).
 
 
 [2]
 The path of a food additive is almost as circuitous as that of a drug. A food additive which is not exempt from the regulation requirement and for which there is no regulation prescribing its use is deemed to be unsafe under § 348(a). A food that contains a food additive deemed unsafe is considered adulterated for purposes of § 342(a)(2)(C). A food that is adulterated is subject to seizure under § 334(a)(1)
 
 
 [3]
 The second route for a food additive to avoid the stigma of lack of safety under § 348(a), supra, footnote 2, is exemption under § 348(i), which is limited to food additives "intended solely for investigational use by qualified experts."
 
 
 [4]
 The statutory mechanism by which this result is achieved lies in the definitions. Only new animal drugs are required to be approved pursuant to § 355. An animal drug is a new animal drug if it "is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof," or if the "drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions. . . ." § 321(w)(1) and (2)
 All "food additives" are subject to the requirements of § 348(a), but a substance is defined as a food additive only if it is "not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures . . . to be safe under the conditions of its intended use . . ." § 321(s).