**SOUTHEASTERN MINERALS, INC. and Marshall Minerals, Inc., Plaintiffs-Appellees,**

v.

**Patricia Roberts HARRIS, as Secretary of Health and Human Services, et al., Defendants-Appellants.**

No. 78–2270.

United States Court of Appeals, Fifth Circuit.

July 30, 1980.

Gregory J. Leonard, Asst. U. S. Atty., Macon, Ga., Frederick H. Degnan, Assoc. Chief Counsel, F.D.A., Rockville, Md., Susan J. Atkinson, Robert B. Nicholson, Dept. of Justice, Washington, D. C., Richard M. Cooper, Chief Counsel, Arthur N. Levine, Deputy Chief Counsel, F. D. A., Rockville, Md., for defendants-appellants.

Ben Kirbo, Bainbridge, Ga., for plaintiffs-appellees.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

In this appeal we review that portion of a district court judgment conditionally enjoining various federal officials[1] charged with the enforcement of the Food, Drug, and Cosmetic Act [the Act], 21 U.S.C. §§ 301–392, from (1) interfering in any way with the manufacturing and marketing of the appellees' gentian violet premix product and (2) inspecting or visiting the appellees' offices and plants. We affirm in part and vacate in part the judgment appealed from.

In March 1976, Marshall Minerals, Inc., [Marshall] began to manufacture and Marshall and Southeastern Minerals, Inc., [Southeastern] began to distribute a poultry feed premix product containing gentian violet.[2] Marshall and Southeastern asserted in 1976 and continue to contend today that gentian violet as a component of premix products designed to be added to animal feed is "generally recognized, among experts qualified by scientific training and experience to evaluate its safety, . . . to be safe under the conditions of its intended use" [GRAS] and thus is exempt from regulation as a food additive under the Act.[3] Accordingly, Marshall and South-

---

1. The appellants are Patricia Roberts Harris, Secretary of the Department of Health and Human Services; Donald Kennedy, Commissioner of the Food and Drug Administration; and Herbert Friedlander, Acting Director of the Bureau of Veterinary Medicine.

2. The product is marketed as "MM–SEM 1.60% GENTIAN VIOLET PREMIX." It contains 1.60% gentian violet and 98.4% calcium carbonate and is designed to be added to poultry feed as a mold and fungus inhibitor. When the product is added to feed at the recommended rate of one pound of premix to one ton of feed, the resulting feed contains eight parts per million (8 ppm) gentian violet.

3. The Act defines "food additive" as:
   any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), *if such substance is not*

eastern chose to market the premix product without first securing the approval of a food additive regulation by the Food and Drug Administration [FDA].[4]

The appellees continued to manufacture and market the premix product through mid-1977 without interference from any governmental entity or official. However, after the Eighth Circuit's decision in *United States v. Naremco, Inc.,* 553 F.2d 1138 (8th Cir. 1977), Herbert Friedlander, the Acting Director of the Bureau of Veterinary Medicine, on June 21, 1977, wrote to all manufacturers of gentian violet products, including Marshall, stating FDA's opinion that "[g]entian violet as a component of animal feed constitutes a 'food additive' and may not be shipped for that purpose since there is no regulation for its safe use." The letter continued to advise "that the marketing of gentian violet products intended for use in animal food . . . is in violation of the Act . . . [and] makes the products, the firms and the officials within those firms responsible for the violation, subject to regulatory action."

A series of meetings and conferences followed Marshall's receipt of the June 21,

1977, letter during which representatives from Marshall, Southeastern, and the FDA attempted to resolve the GRAS status of the premix product. No resolution was forthcoming, however, as both sides adhered to their original positions. Marshall and Southeastern asserted that the gentian violet premix product was GRAS and thus exempt from FDA regulation as a food additive. The FDA contended that the product was not GRAS and therefore was subject to regulation under the Act.

On August 18, 1977, Marshall, although still asserting that its product was exempt from FDA regulation, forwarded to the FDA a petition proposing a food additive regulation that would permit the marketing of the gentian violet premix. The FDA received the petition on August 22, 1977, and acknowledged its receipt by letter to Marshall on August 25, 1977. On October 17, 1977, the FDA again wrote Marshall, commenting that the petition was then under review.

Subsequently, on October 20, 1977, FDA inspectors visited Marshall's offices in a Bainbridge, Georgia, tri-office complex seeking to inspect Marshall's manufacturing fa-

*generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use*; except that such term does not include—

    (1) a pesticide chemical in or on a raw agricultural commodity; or

    (2) a pesticide chemical to the extent that it is intended for use or is used in the production, storage, or transportation of any raw agricultural commodity; or

    (3) a color additive; or

    (4) any substance used in accordance with a sanction or approval granted prior to September 6, 1958 pursuant to this chapter, the Poultry Products Inspection Act (21 U.S.C. § 451 and the following) or the Meat Inspection Act of March 4, 1907, as amended and extended; or

    (5) a new animal drug.

21 U.S.C. § 321(s) (emphasis added).

**4.** The Act permits any person to file a petition with the FDA proposing a regulation prescribing the conditions under which a food ad-

ditive may be safely used. *See* 21 U.S.C. § 348(b); 21 C.F.R. §§ 571.1 to 571.130 (1979). See also note 7, *infra.* The Commissioner is prohibited by statute from establishing a food additive regulation if a fair evaluation of the data "fails to establish that the proposed use of the food additive, under the conditions of use . . . specified in the regulation, will be safe." 21 U.S.C. § 348(c)(3). A product containing a food additive generally is considered adulterated within the meaning of § 342 and thus subject to seizure and condemnation under § 334 if there is not in effect a regulation prescribing the conditions under which the food additive may be safely used. *See id.* § 348(a)(2). *See also id.* §§ 334(a), 342(a)(2)(C). *But see id.* § 348(a)(1). A manufacturer who markets a product that possibly is subject to FDA regulation as a food additive without first having secured approval of a food additive regulation leaves to the FDA the burden of initiating enforcement proceeding under the Act to resolve the GRAS status of the product. *See United States v. Articles of Food and Drug . . . Coli-trol 80, . . . Enthrol-P,* 518 F.2d 743, 745–46 (5th Cir. 1975). *See also* 21 U.S.C. §§ 332–34.

cilities. After learning that those facilities were located in Marshall, Texas, rather than Bainbridge, Georgia, the FDA inspectors departed only to return to the complex later in the day to inspect the offices of Southeastern and Flint River Mills. On October 26, 1977, agents of the State of Texas, apparently acting at the request of the FDA, inspected Marshall's manufacturing facilities and forwarded a report of their findings to the FDA.

The next day officials of the State of Arkansas, at the instance of the FDA, issued a "stop use" order on 17,300 pounds of Marshall's gentian violet premix product then in the hands of Johnson Feed Mills in Mena, Arkansas. The state officials based their order on the product's alleged status as an unapproved food additive despite the fact that the product was properly registered with the Arkansas State Plant and Feed Board.

A conference was held on October 31, 1977, between various FDA officials, the president of Marshall and Southeastern, and Mr. Ben Kirbo, legal counsel for Marshall and Southeastern. The district court found that the meeting had been requested by Marshall and Southeastern in a good faith, cooperative attempt to resolve amicably the disagreement over the GRAS status of the gentian violet premix product. No resolution of that dispute occurred despite Marshall's announcement that it voluntarily had ceased the production of the premix product on October 22, 1977. Near the end of the meeting, Acting Director Friedlander threatened Marshall and Southeastern with endless litigation should they continue to press their position by stating to their counsel: "Mr. Kirbo, your client cannot afford

to litigate with us. We are the United States of America. Our resources are endless and we will use them all against you." [5]

The State of Connecticut on November 3, 1977, again at the instance of the FDA, issued an embargo against 36,000 pounds of Marshall's gentian violet premix product then in the hands of Central Connecticut Farmers Coop. Like the Arkansas "stop use" order, the Connecticut embargo was based on the product's alleged status as an unapproved food additive.

On November 7 and 8, 1977, a FDA inspector made six separate visits to and inspections of Marshall's manufacturing facilities. The district court characterized these visits and inspections as harassing and threatening and noted that the FDA official on several occasions threatened Marshall with the use of criminal warrants if the inspector's various demands for the production of records and documents were not complied with. After these visits and inspections, Marshall unsuccessfully attempted to obtain the FDA's consent to the release of the 53,300 pounds of premix product being held by state officials in Arkansas and Connecticut.

On December 13, 1977, Marshall and Southeastern instituted this action pursuant to 42 U.S.C. § 1361, seeking a writ of mandamus and other equitable relief. On December 14, 1977, the FDA instituted a formal libel proceeding pursuant to 21 U.S.C. § 334 against the premix product being held by state officials in Arkansas. A similar § 334 proceeding was instituted in Connecticut on December 30, 1977.[6] While this action was pending before the district court, Marshall on January 30, 1978, received a

---

**5.** Mr. Kirbo testified that after Mr. Friedlander's statement, Mr. Philip Sheeler, Chief of the Case Guidance Branch of the Bureau of Veterinary Medicine, confirmed Friedlander's threat of endless litigation by stating "we are not shy about admitting it."

**6.** The United States instituted these actions in the United States District Courts for the District of Connecticut and the Western District of Arkansas. Pursuant to Marshall's § 334(b) request, these actions were transferred to the United States District Court for the Northern

District of Georgia and were consolidated. In the consolidated action, the district court granted the government's motion for summary judgment, holding that the gentian violet premix product was not GRAS and thus was subject to regulation by the FDA as a food additive. Marshall appealed. That appeal, *United States v. An Article of Food Consisting of 345/50-pound Bags, etc.,* 622 F.2d 768 (5th Cir. 1980), was consolidated for oral argument with this appeal and also is decided today.

letter from the FDA stating that the August 18, 1977, petition proposing a food additive regulation covering the gentian violet premix product would not be considered as having been filed because of certain deficiencies. This letter notice is inconsistent with procedures for prompt notice established by the agency's regulations.[7]

The district court held an evidentiary hearing in this action and, in a March 3, 1978, opinion and order, granted equitable relief to Marshall and Southeastern. In part, the district court's order enjoined various federal officials charged with the enforcement of the Act from interfering in any way with the manufacturing and marketing of the appellees' gentian violet premix product and from inspecting or visiting the appellees' offices and plants. It also enjoined those same officials from failing to inform Marshall with specificity of the deficiencies in its August 18, 1977, petition, from failing to allow Marshall a reasonable time in which to correct such deficiencies, and from delaying final action on the petition.[8] The federal officials appeal only

---

**7.** The Act and agency regulations promulgated thereunder provide the framework within which petitions proposing a food additive regulation are to be filed with and considered by the FDA. *See* 21 U.S.C. § 348; 21 C.F.R. §§ 571.1 to 571.130. A petition must contain specific data and must be submitted in a specified form. *See* 21 U.S.C. § 348(b)(2); 21 C.F.R. § 571.1(a)–(c), (e)–(f), (k). The Commissioner must notify a petitioner within fifteen days of the receipt of a petition of the acceptance or nonacceptance of the petition for filing. *See id.* § 570.1(i)(1). If the FDA accepts the petition for filing, the date of the letter of notification sent to the petitioner becomes the date of filing for the purposes of the Act. *See id.* If the FDA does not accept the petition for filing, the Commissioner's letter of notification must state the reasons for nonacceptance and must afford the petitioner an opportunity to supplement the deficient petition. *See id.* The FDA will not accept a petition if any of the required data are lacking or if the data set forth are not readily understandable. *See id.* § 571.1(d), (g). If a petitioner chooses to supplement or explain a deficient petition and if the FDA deems the supplementary material or explanation to be acceptable, the FDA must notify the petitioner of the petition's acceptance and the date of the letter of notification becomes the date of filing. *See id.* § 570.1(i)(1). However, a petitioner who chooses not to supplement or explain his original petition may request in writing that the petition be filed as originally submitted. *See id.* Upon such a request, the FDA must file the petition and notify the petitioner of its filing. *See id.* Again, the date of the notification letter becomes the date of filing. *See id.* The Commissioner must publish notice of the proposed regulation in the Federal Register within thirty days of the date the petition was filed. *See* 21 U.S.C. § 348(b)(5); 21 C.F.R. § 570.1(i)(2).

The Commissioner must act on a pending petition within ninety days of the date the petition was filed, but may extend that period by an additional ninety days to enable him to further study and investigate the petition. *See* 21 U.S.C. § 348(c)(2); 21 C.F.R. § 571.100. No later than 180 days after the filing of the petition, the Commissioner must either establish a regulation prescribing the conditions under which the food additive may be safely used or deny the petition and notify the petitioner of the reasons for the denial. *See* 21 U.S.C. § 348(c)(1); 21 C.F.R. § 571.100(2).

Any person adversely affected by either the establishment of the food additive regulation or the denial of the petition, may, within thirty days after the publication of the relevant order, file objections with the Commissioner and may request a public hearing. *See* 21 U.S.C. § 348(f)(1); 21 C.F.R. § 571.110. *See also id.* §§ 12.1 to 12.139. Additionally, any person adversely affected by a final order of the FDA may obtain judicial review in a United States Court of Appeals by filing a petition for review within sixty days after the entry of the order. *See* 21 U.S.C. § 348(g); 21 C.F.R. §§ 12.140 to 12.159 (1978).

**8.** More precisely, the March 3, 1978, order enjoined the named defendants and all other persons acting in their behalf or in concert with them from:

(1) Interfering in any way with the manufacture and/or marketing of Plaintiffs' gentian violet premix product unless and until a final determination has been made in the manner prescribed by the Food, Drug and Cosmetics Act that the product is subject to regulation under the Act and a final regulation has been promulgated (and judicially approved if judicial review is sought) either permitting the use of gentian violet under prescribed terms and conditions or denying the use of gentian violet under all circumstances.

(2) Making any further "inspections" of or visits to the plants or offices of the Plaintiffs or making any demands upon the Plaintiffs unless and until the petition heretofore filed by the Plaintiffs as above referred to has been acted upon as required by the Act.

(3) Failing to inform the Plaintiffs specifically in what manner the Plaintiffs' pending

from that portion of the district court's judgment enjoining them from interfering with the manufacturing and marketing of the premix product and from inspecting or visiting the appellees' offices and plants.

## I.

■ The district court acted in excess of its jurisdiction by enjoining the federal officials from interfering with the manufacturing and marketing of the appellees' premix product insofar as the injunction prohibited those officials either from making additional seizures of the product or from subsequently initiating additional enforcement proceedings under § 334.[9] Although a district court is not totally without jurisdiction to conduct pre-enforcement review of FDA actions, see *Abbott Laboratories v. Gardner*, 387 U.S. 136, 139–48, 87 S.Ct. 1507, 1510–15, 18 L.Ed.2d 681, 686–91 (1967), such jurisdiction is limited. In the instant case, the district court exceeded that jurisdiction.

In *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court upheld the multiple seizure provision of § 334 and, in so doing, concluded that district courts are without jurisdiction to review the FDA's determination of probable cause necessary for the initiation of enforcement actions. *Id.* at 600–602, 70 S.Ct. 873–74, 94 L.Ed. at 1094–1095. *See also Pharmadyne Laboratories, Inc. v. Kennedy*, 596 F.2d 568, 570–73 (3d Cir. 1979); *Parke, Davis & Co. v. Califano*, 564 F.2d 1200, 1204–06 (6th Cir. 1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1522, 55 L.Ed.2d 539 (1978); *Natick Paperboard*

*Corp. v. Weinberger*, 498 F.2d 125, 127–29 (1st Cir. 1974), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976). In noting that it was Congress' intent that the administrative determination to initiate a § 334 enforcement action be made without a hearing, the Supreme Court held that the opportunity to appear and be heard at the ensuing libel proceeding satisfied the requirements of due process. 339 U.S. at 598, 600, 70 S.Ct. at 872–73, 94 L.Ed. at 1092. Moreover, the Supreme Court noted that the protection afforded the public by a swift and effective administrative process would seriously be impaired if a district court could intercede and enjoin officials of the FDA from initiating enforcement proceedings.

The purpose of the multiple seizure provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of seizures, and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by multiple seizures. . . . The means which Congress provided to protect consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the in-

petition is deficient, if the Defendants assert such deficiency, and thereafter allowing a reasonable time within which such alleged deficiency may be satisfied.

(4) Delaying final action upon Plaintiffs' pending petition in contravention of the provisions of the Act.

**9.** The wording of this portion of the district court's injunction is sufficiently broad so as to encompass acts other than the seizing of the gentian violet premix product and the initiating of § 334 enforcement proceedings. However, the parties in their written briefs and oral arguments to this court limited their discussion of this portion of the injunction to these two spe-

cific acts. Moreover, the record fails to evidence any additional acts of the defendant federal officials that interfere with the manufacturing and marketing of the premix product that are not specifically and expressly addressed by other portions of the injunction. We therefore limit our analysis to the case presented to us and express no opinion as to what effect, if any, the Supreme Court's opinion in *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1053 (1950), would have on a district court's power to enjoin acts other than the seizing of products and the initiating of § 334 enforcement proceedings.

jury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of multiple seizures. We would impair or destroy the effectiveness of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail.

*Id.* at 601, 70 S.Ct. at 874, 94 L.Ed. at 1057.

The present case falls directly within the ambit of the jurisdictional prohibition established in *Ewing*.[10] The fact that seizures of the appellees' product were yet unconsummated by federal officials at the time the appellees filed this action is of no consequence. *See Parke, Davis & Co. v. Califano*, 564 F.2d at 1203; *Natick Paperboard Corp. v. Weinberger*, 498 F.2d at 126–29. Neither is it of consequence that the FDA subsequently consummated two seizures that resulted in § 334 libel proceedings being filed between the time the appellees filed this action with the district court and the time the district court entered its order of relief. *See Parke, Davis & Co. v. Califano*, 564 F.2d at 1203. Similarly, the appellees' reliance on *Abbott Laboratories* is misplaced. There, the Supreme Court held that a district court had jurisdiction of an action seeking pre-enforcement review of an industry-wide regulation promulgated by the FDA pursuant to a formal rulemaking proceeding. In so holding, the Supreme Court distinguished *Abbott Laboratories* from *Ewing*, noting that their prior "decision was quite clearly correct" and stating:

> The drug manufacturer in *Ewing* was quite obviously seeking an unheard of form of relief which, if allowed, would have permitted interference in the early stages of an administrative determination as to specific facts, and would have prevented the regular operation of the seizure procedures established by the Act. That the Court refused to permit such an action is hardly authority for cutting off the well-established jurisdiction of the federal courts to hear, in appropriate cases, suits under the Declaratory Judgment Act and the Administrative Procedure Act challenging final agency action of the kind present here.

387 U.S. at 147–48, 87 S.Ct. at 1515, 18 L.Ed.2d at 689. No final agency action of the type presented to the Supreme Court in *Abbott Laboratories* is present in the instant case.[11] Rather, in seeking to enjoin federal officials from interfering with the manufacturing and marketing of their product, the appellees necessarily sought pre-enforcement review of the FDA's determination that probable cause existed to seize and to initiate enforcement proceedings against the premix product, a review clearly proscribed by *Ewing*. Because the district court acted in excess of its jurisdiction in granting such relief, we vacate the portion of the district court's judgment that enjoined the appellants from interfering in any way with the manufacturing and marketing of the appellees' premix product.

## II.

■ The district court abused its discretion by enjoining the appellants from "[m]aking any further inspections of or visits to the plants or offices of the Plaintiffs or making any demands upon the Plaintiffs," insofar as those acts were authorized

---

10. Considered in the context of this case brought pursuant to 28 U.S.C. § 1361, the jurisdictional prohibition established in *Ewing* is not a lack of subject matter jurisdiction over the case as a whole. Rather, it expresses a total and complete proscription on the district court's power both to undertake a pre-enforcement review of the FDA's determination of probable cause and to enjoin federal officials from acting upon that determination by seizing products or initiating enforcement proceedings under the Act. By removing this power from the district court, *Ewing* does not affect the district court's power to entertain, adjudicate,

and grant relief as to the remaining issues in the case over which the court properly has subject matter jurisdiction. *Cf. Natick Paperboard Corp. v. Weinberger*, 498 F.2d at 128–29 (district court, although without jurisdiction under *Ewing* to enjoin seizures of paper food packing materials, had jurisdiction under the Declaratory Judgment Act to determine whether the FDA had authority to regulate such products).

11. The FDA has only issued a general statement of agency policy. *See* text at note 15, *infra*.

under 21 U.S.C. § 374. However, the district court acted within its discretion by enjoining the appellants from taking such actions insofar as the visits, inspections, and demands were unduly threatening, harassing, or otherwise beyond the scope of the agency's authority under § 374.

In § 374, Congress vested the Secretary of the Department of Health and Human Services, and, through her, the Commissioner of the Food and Drug Administration, with the authority to enter and inspect "any factory, warehouse, or establishment in which food, drugs, devices, or cosmetics are manufactured, processed, packed, or held, for introduction into interstate commerce." 21 U.S.C. § 374(a). The Commissioner's § 374 authority is but a part of the overall authority granted to him under the Act. Considered as such, it provides the means by which the FDA can gather the information and facts necessary for it to determine whether an actionable violation of the Act has occurred. That grant of authority, bound by a statutory restraint of reasonableness as to time, limit, and manner, must, however, be exercised within a specified and clearly defined procedure. *See id.* § 374(b)–(d). Where the visits, inspections, and demands are made in a manner inconsistent with the procedures specified in § 374, a district court acts within its discretion by enjoining officials of the FDA from acting beyond their statutory authority. Here, however, the district court went well beyond that and enjoined the defendant federal officials from making *any* additional visits, inspections, or demands. If a district court could intercede and enjoin officials of the FDA from conducting any such activities regardless of their compliance with the procedures specified in § 374, the protection afforded the public by swift and effective agency action would seriously be impaired.[12]

Accordingly, we hold that the district court abused its discretion by enjoining the federal officials from visiting and inspecting the appellees' offices and plants and from making any demands upon the appellees, insofar as those visits, inspections, and demands were authorized by and conducted in compliance with § 374. To the extent that the district court abused its discretion in granting such relief, we also vacate that portion of the district court's judgment.

### III.

This appeal, together with *United States v. An Article of Food Consisting of 345/50-Pound Bags, etc.*, 622 F.2d 768 (5th Cir. 1980), which we also decide today, presents ongoing chapters in the lengthy litigation that surrounds the use of gentian violet in animal feed. It is a history that demands *obiter dictum* reflecting upon the actions of the FDA with respect to both the controversy over gentian violet in general and the dispute over Marshall's individual product in particular. The former indicates an inefficient use of limited agency and judicial resources. The latter is an inexcusable misapplication of agency power.

As to the former, the FDA since the late 1960s steadfastly has adhered to the belief that the use of gentian violet in animal feed is not GRAS. Consistent with that belief, and because no regulation approving such a use of gentian violet exists, the FDA through a series of enforcement proceedings brought against individual products and manufacturers has sought to remove such products from the stream of interstate commerce. *See United States v. Naremco, Inc.*, 553 F.2d 1138 (8th Cir. 1977); *United States v. 41 Cases, More or Less*, 420 F.2d 1126 (5th Cir. 1970); *United States v. 14 Cases, More or Less, . . . Naremco Medi-Matic Free Choice Poultry Formula*, 374 F.Supp. 922 (W.D. Mo. 1974); *United States v. Articles of Food and Drug Coli-*

---

12. The appellees do not dispute this result. Indeed, in their Reply to the Defendants' Motion for a Stay Pending Appeal, the appellees noted to the district court:

There was no intention [at the hearing], nor is there intention now to prohibit inspec-

tions by the Food and Drug Administration. Very clearly, these people do have the right to conduct reasonable inspections at reasonable times and reasonable places.

*trol 80 Medicated,* 372 F.Supp. 915 (N.D. Ga. 1974), *aff'd,* 518 F.2d 743 (5th Cir. 1975); *United States v. An Article of Drug . . . Entrol-C Medicated . . .,* 362 F.Supp. 424 (S.D. Calif. 1973), *aff'd,* 513 F.2d 1127 (9th Cir. 1975); *United States v. 7 Cartons, More or Less . . . "Ferro-Lac Swine Formula Concentrate (Medicated),"* 293 F.Supp. 660 (S.D. Ill. 1968), *aff'd in part and vacated in part,* 424 F.2d 1364 (7th Cir. 1970). See also *United States v. Dan-Mar Enterprises, Inc.,* No. C79–08G (N.D. Ga. Sept. 21, 1978), *appeal dismissed,* No. 78–3666 (5th Cir. Jan. 22, 1979). The decisive issue in each case necessarily was the GRAS status of gentian violet. The FDA met with universal success in those cases. However, subsequent events demonstrate that those individual victories were more Pyrrhic than meaningful.

The mere existence of this action testifies to the agency's failure to remove totally from the stream of interstate commerce those premix products that contain gentian violet. That failure necessarily has resulted from the inherent nature of the enforcement litigation utilized by the FDA. By focusing on individual products and manufacturers, the actions attacked the gentian violet controversy in piecemeal fashion. As the Eighth Circuit observed in *Naremco,* a manufacturer whose gentian violet premix product is condemned in a § 334 libel proceeding remains able to market a replacement product with a similar but not identical chemical composition. *See United States v. Naremco, Inc.,* 553 F.2d at 1140. By doing so, a manufacturer forces the FDA to initiate additional seizures and enforcement proceedings that require a new judicial determination of the GRAS status of gentian violet. See *id.* Moreover, even where the FDA succeeds in ending the litigious cycle of a single manufacturer,[13] other

manufacturers remain free to market premix products that are identical or similar[14] in composition to those previously condemned, again forcing the FDA to utilize the enforcement procedures of the Act.

As the result of various inquiries concerning the GRAS status of gentian violet, the FDA on April 17, 1974, issued a general statement of policy in Compliance Policy Guide No. 7126.02. *See generally* 21 C.F.R. §§ 10.85(c), (d)(3) (1978). There, the FDA stated that "[t]here is no food additive regulation providing for the safe use of gentian violet in animal feed, nor is there prior sanction for its use. Experts have informed the Food and Drug Administration that gentian violet is not generally recognized as safe for use in animal feed." The FDA concluded that "[g]entian violet used in animal feed without any therapeutic claim constitutes an unsafe food additive; it may not be used legally in animal feed in the absence of a food additive regulation providing for its safe use."

Because the FDA issued the Compliance Policy Guide as a general statement of agency policy, it was not required to comply with the formal rulemaking requirements of the Administrative Procedure Act. *See* 5 U.S.C. § 553(b)(A). *See also* 21 C.F.R. § 10.90(b). Accordingly, the April 17, 1974, Guide is not legally conclusive of the GRAS status of gentian violet when that issue is raised either before the FDA in a subsequent agency proceeding or before a court in a subsequent judicial action. *See id.* § 10.85(j). Nevertheless, the statement of policy represents the FDA's formal position on the use of gentian violet and obligates the agency to act in a manner consistent with that policy until it is amended or revoked.[15] *See id.* §§ 10.85(e)–(g), 10.-90(b)(2)–(3), (5).

---

**13.** As the result of an action brought under 21 U.S.C. § 332(a), Naremco, Inc., was enjoined from making future interstate sales of gentian violet products used as animal drugs or additives to animal feed until and unless premarketing approval was obtained from the FDA. *See United States v. Naremco, Inc.,* 553 F.2d at 1140–43. *See generally* 21 U.S.C. § 332.

**14.** The chemical composition of the appellees' MM–SEC 1.60% GENTIAN VIOLET PREMIX is remarkably similar to the chemical composition of Naremco's GV–ELEVEN MOLD INHIBITOR. *Compare* note 2, *supra, with United States v. Naremco, Inc.,* 553 F.2d at 1141 n.4.

**15.** *See* note 11, *supra.*

■■ The agency and judicial resources expended in connection with the gentian violet controversy could have been greatly reduced had the FDA made an industry-wide determination of the GRAS status of gentian violet through a formal, legislative rulemaking proceeding, complete with notice, comment, and, if needed, judicial review. The FDA has the authority to determine whether a particular product requires an approved food additive regulation in order to be marketed in interstate commerce. *See* 21 U.S.C. § 348(d); 21 C.F.R. §§ 570.-35(a)-(b), 570.38(a), (b)(1) (1979). *See generally Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 651–54, 93 S.Ct. 2488, 2493–94, 37 L.Ed.2d 235, 240–42 (1973); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 624, 93 S.Ct. 2469, 2480, 37 L.Ed.2d 207, 220 (1973). Indeed, the FDA, as the administrative agency created by Congress to administer the Act, cannot intelligently and rationally perform its regulatory duties unless it determines what products are "food additives" under 21 U.S.C. § 321(s) and what products, because of their GRAS status, are exempt from regulation. Although agency determinations often proceed on a case-by-case basis, there is no constitutional reason requiring such individual adjudications. *See Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 624–25, 93 S.Ct. at 2480, 37 L.Ed.2d at 220. In the context of the marketing of misbranded or adulterated foods or drugs, "a single administrative proceeding in which each manufacturer may be heard is constitutionally permissible." *Id.* at 625, 93 S.Ct. at 2481, 37 L.Ed.2d at 247. Such a single, industry-wide proceeding would have provided the comprehensive treatment necessary for quick and effective relief. Instead, by acting against individual products and manufacturers, the FDA succeeded only in "creat[ing] delay where in the interest of public health there should [have been] prompt action." *See id.*

By providing a definitive agency determination of the GRAS status of gentian violet, a formal rulemaking proceeding would have effectively decided any industry questions as to whether specific products could be marketed without an approved food additive regulation. *See generally Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. at 653–54, 93 S.Ct. at 2494, 37 L.Ed.2d at 241–42. Moreover, such a formal agency determination would have eliminated the litigation of a product's GRAS status in a § 334 proceeding by permitting a court to defer to the expertise of the FDA by inquiring simply whether the product was, in fact, a product that contained gentian violet in a combination determined in the formal proceeding not to be GRAS. The failure of the FDA to have made an industry-wide determination of the GRAS status of gentian violet through a formal rulemaking proceeding has resulted in a regrettable, needless waste of the time, wealth, and energies of the agency, the industry, the judiciary, and society as a whole.

Secondly, the actions of the FDA with respect to this particular gentian violet premix product demonstrate errors both of commission and omission. First, the attitude of Acting Director Friedlander as evidenced by his October 31, 1977, statement demonstrates a bureaucratic hubris that confuses abuse of power with reason. Second, the failure of the FDA to comply with its own regulations by promptly notifying Marshall of the acceptance or nonacceptance of its August 18, 1977, petition is, to use the agency's own description, totally regrettable and inexcusable. Third, the FDA's disregard for the statutory and regulatory requirement that the agency act on a pending petition within a maximum of 180 days is equally regrettable and inexcusable. Fourth, the FDA's abuse of its statutory rights of entry and inspection so as to harass and threaten Marshall and Southeastern can in no way be condoned.

The district court, faced with this record, acted well within its discretion in enjoining the defendant federal officials from failing to inform Marshall with specificity of the deficiencies in its August 18, 1977, petition, from failing to allow Marshall a reasonable time within which to correct such deficiencies, and from delaying final action on the

petition.[16] The FDA wisely decided not to appeal from that portion of the district court's judgment.

The judgment appealed from is

AFFIRMED IN PART and VACATED IN PART.

16. On May 8, 1978, the FDA complied with paragraph three of the district court's order by accepting the August 18, 1977, petition for filing and by notifying Marshall in detail of the alleged deficiencies in the petition. *See generally* 21 C.F.R. §§ 570.1(d), (i)(1). On May 19, 1978, notice of the petition's acceptance for filing and the proposed regulation was published in the Federal Register. *See* 43 Fed.Reg. 21,727 (1978). *See generally* 21 U.S.C. § 348(b)(5); 21 C.F.R. § 570.1(i)(2). Marshall supplemented its petition on July 7, 1978, by providing the FDA with various additional information. *See id.* § 570.1(i)(1). On September 19, 1978, the FDA notified Marshall of the denial of the petition, stating that the data submitted were inadequate to support the approval of the proposed food additive petition. *See generally* 21 U.S.C. § 348(c)(1); 21 C.F.R. § 571.100(2). An order denying the petition subsequently was published in the Federal Register on March 30, 1979. *See* 44 Fed.Reg. 19,-035 (1979). That order provided notice that any person adversely affected by the denial of the petition had until April 30, 1979, to submit written objections and make a written request for a public hearing. *See id.* at 19,038. *See generally* 21 U.S.C. § 348(f)(1); 21 C.F.R. § 571.110. On April 26, 1979, Marshall submitted in writing twenty-four objections to the FDA's order together with a request for a public hearing on each of the objections. Marshall additionally requested and received an extension of time until August 3, 1979, in which to file data in support of its objections. *See* 44 Fed.Reg. 40,933 (1979). On March 24, 1980, the FDA issued a final order denying Marshall's request for a public hearing. *See* 45 Fed.Reg. 20,559 (1980). *See generally* 21 U.S.C. § 348(f); 21 C.F.R. § 12.29. Marshall filed a timely petition for review with this court pursuant to 21 U.S.C. § 348(g). *Marshall Minerals, Inc. v. Food and Drug Administration*, No. 80–7369 (5th Cir., filed May 15, 1980). We intimate no opinion as to the merits of that pending petition.