**UNITED STATES of America, Plaintiff-Appellee,**

v.

**AN ARTICLE OF FOOD CONSISTING OF 345/50–POUND BAGS, etc., Defendant,**

**Marshall Minerals, Inc., Intervenor-Appellant.**

No. 79–3656.

United States Court of Appeals, Fifth Circuit.

July 30, 1980.

See also 622 F.2d 758 (5th Cir. 1980).

Ben Kirbo, Bainbridge, Ga., for intervenor-appellant.

Frederick H. Degnan, Asst. Chief Counsel for Veterinary Medicine, Food & Drug Admin., Rockville, Md.

John J. Powers, III, James Laskey, Dept. of Justice, Washington, D.C., for U.S.A.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

In this appeal we review an order of the district court granting the government's motion for summary judgment. Because the district court erred by assessing the probative value of the evidence and because genuine issues of material fact exist, we reverse the judgment appealed from and remand this action to the district court.

These libel proceedings [1] are but one phase of an ongoing dispute [2] between Mar-

---

1. On October 27, 1977, officials of the State of Arkansas, at the instance of the FDA, issued a "stop use" order on 17,300 pounds of the gentian violet premix product then in the hands of Johnson Feed Mills in Mena, Arkansas. Subsequently, on November 3, 1977, officials of the State of Connecticut, again at the instance of the FDA, issued an embargo against 36,000 pounds of the premix product then in the hands of the Central Connecticut Farmers Coop. In each case, state officials based their actions on the product's alleged status as an unapproved food additive. On December 14 and 30, 1977, the United States initiated formal libel proceedings pursuant to 21 U.S.C. § 334 against the seized product in the United States District Courts for the Western District of Arkansas and the District of Connecticut. Pursuant to Marshall's § 334(b) request, these actions were transferred to the United States District Court for the Northern District of Georgia and were consolidated.

2. This case was consolidated for oral argument with *Southeastern Minerals, Inc. v. Harris,* 622 F.2d 758 (5th Cir. 1980), which we also decide today. The facts relating to the ongoing dispute between Marshall, Southeastern Minerals, Inc., and the FDA are discussed in great detail in that opinion. A third action relating to this controversy currently is pending in this court. *See Marshall Minerals, Inc. v. Food and Drug Administration,* No. 80–7369 (5th Cir., filed

shall Minerals, Inc., [Marshall] and the Food and Drug Administration [the FDA] over the possible food additive status of a poultry feed premix product manufactured and marketed by Marshall. In March 1976, Marshall began to manufacture and Marshall and Southeastern Minerals, Inc., began to market a poultry feed premix product containing gentian violet.[3] Marshall and Southeastern asserted in 1976 and continue to contend today that gentian violet as a component of premix products designed to be added to animal feed is "generally recognized, among experts qualified by scientific training and experience to evaluate its safety, . . . to be safe under the conditions of its intended use" [GRAS] and thus is exempt from regulation as a food additive under the Food, Drug, and Cosmetic Act [the Act], 21 U.S.C. §§ 301–392.[4] Accordingly, Marshall chose to market the premix product without first securing the approval of a food additive regulation by the FDA.[5]

On June 21, 1977, the FDA by letter first advised Marshall of its long-held belief that the use of gentian violet as a component of animal feed is not GRAS, stating "that the marketing of gentian violet products intended for use in animal food . . . is in violation of the Act . . . [and] makes the products, . . . subject to regulatory action." After a series of meetings and conferences held over the next five months proved unsuccessful in resolving the dispute over the GRAS status of the premix product, the FDA initiated the formal seizures of 53,300 pounds of the product described in note one. The present libel proceedings were filed on December 14 and December 30, 1977.

Marshall and the United States each engaged in discovery while this case was pending before the district court. That discovery resulted, in part, in a series of admissions by Marshall[6] that left the GRAS status of the gentian violet premix product as the primary issue for resolution by the district court.[7] The government filed mo-

---

May 15, 1980). *See also Southeastern Minerals, Inc. v. Harris,* 622 F.2d at 766 n.13. We intimate no opinion as to the merits of that action.

3. The product is marketed as "MM–SEM 1.60% GENTIAN VIOLET PREMIX." It contains 1.60% gentian violet and 98.4% calcium carbonate and is designed to be added to poultry feed as a mold and fungus inhibitor. When the product is added to feed at the recommended rate of one pound of premix to one ton of feed, the resulting feed contains eight parts per million (8 ppm) gentian violet.

4. The Act defines "food additive" as:
any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component or otherwise affecting the characteristics of any food (including any substance intended for use in producing, manufacturing, packing, processing, preparing, treating, packaging, transporting, or holding food; and including any source of radiation intended for any such use), *if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its*

*intended use*; except that such term does not include—
(1) a pesticide chemical in or on a raw agricultural commodity; or
(2) a pesticide chemical to the extent that it is intended for use or is used in the production, storage, or transportation of any raw agricultural commodity; or
(3) a color additive; or
(4) any substance used in accordance with a sanction or approval granted prior to September 6, 1958 pursuant to this chapter, the Poultry Products Inspection Act (21 U.S.C. § 451 and the following) or the Meat Inspection Act of March 4, 1907, as amended and extended; or
(5) a new animal drug.
21 U.S.C. § 321(s) (emphasis added).

5. *See Southeastern Minerals, Inc. v. Harris,* 622 F.2d at 760 n.4 & 762 n.7.

6. Marshall admitted that (1) its premix product contains 1.60% gentian violet and 98.40% calcium carbonate, (2) no regulation or exemption exists under 21 U.S.C. § 348 establishing, permitting, or approving the use of gentian violet as a component of poultry feed, and (3) it shipped or caused to be shipped in interstate commerce the premix product.

7. Marshall argued that the FDA failed to act in a timely manner on its petition for a food addi-

tion for summary judgment and submitted affidavits from two scientists who opined that "experts qualified to evaluate the safety of such food additives do not consider this product or any similar product containing gentian violet as safe for poultry or animals or for humans who consume the products of such poultry or animals." Marshall opposed the government's motion for summary judgment and submitted an affidavit from a scientist who opined that "experts qualified to evaluate the safety of such [products] consider this product as safe for poultry, animals, and for humans who consume the products of such poultry or animals."

The district court, after a review of the affidavits, the parties' admissions, and the parties' answers to interrogatories, granted the government's motion for summary judgment. Marshall appealed. We reverse the judgment appealed from and remand this action to the district court.

 A litigant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Keiser v. Coliseum Properties, Inc.,* 614 F.2d 406, 410 (5th Cir. 1980); *Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators,* 563 F.2d 205, 207 n.1 (5th Cir. 1977); *Irwin v. United States,* 558 F.2d 249, 251 (5th Cir. 1977); *Central Oil & Supply Corp. v. United States,* 557 F.2d 511, 515 (5th Cir. 1977). Conversely, summary judgment is inappropriate where there exists a genuine issue as to any material fact. *See Keiser v. Coliseum Properties, Inc.,* 614 F.2d at 410; *Nunez v. Superior Oil Co.,* 572 F.2d 1119, 1123 (5th Cir. 1978); *A.M.R. Enterprises, Inc. v. United Postal Savings Ass'n,* 567 F.2d 1277, 1279 (5th Cir. 1978); *Clark v. West Chemical Products, Inc.,* 557 F.2d 1155, 1157 (5th Cir. 1977); *Meredith v. Hardy,* 554 F.2d 764, 765 (5th Cir. 1977). The party seeking summary judgment has the burden of demonstrating that there exists no genuine issue as to any material fact. *See Farina v. Mission Investment Trust,* 615 F.2d 1068, 1075 (5th Cir. 1980); *Keiser v. Coliseum Properties, Inc.,* 614 F.2d at 410; *Gossett v. Du-Ra-Kel Corp.,* 569 F.2d 869, 872 (5th Cir. 1978); *Irwin v. United States,* 558 F.2d at 252; *Kellerman v. Askew,* 541 F.2d 1089, 1092 (5th Cir. 1976). In reviewing the pleadings, depositions, answers to interrogatories, admissions, and affidavits to determine whether a genuine issue of material fact exists, a court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *See Keiser v. Coliseum Properties, Inc.,* 614 F.2d at 410; *United States v. Hangar One, Inc.,* 563 F.2d 1155, 1157 (5th Cir. 1977); *Irwin v. United States,* 558 F.2d at 252; *Baw Manufacturing Co. v. Slaks Fifth Ave., Ltd.,* 547 F.2d 928, 930 (5th Cir. 1977); *Kellerman v. Askew,* 541 F.2d at 1092.

 To succeed on its motion for summary judgment in the instant case, the government had the burden of demonstrating that no genuine issue of material fact existed as to either of two issues: the lack of a general reputation for the product's safety among the appropriate experts or the lack of an adequate foundation upon which to base such a general reputation.[8] *See Unit-*

---

tive regulation and unreasonably refused its November 1975 request to export the detained premix product pursuant to 21 U.S.C. § 381. It also argued that the actions taken by the Arkansas and Connecticut authorities at the instance of the FDA constitute illegal detentions of its product. Marshall contends that these actions considered individually or together support dismissal of the libel proceedings. Because of our disposition of the primary issue in this appeal and because the record does not develop these subsidiary issues adequately, we intimate no opinion on their merit.

8. Normally, experts qualified by scientific training and experience base their recognition of a product's safety on scientific procedures. However, if the product or substance was used in food prior to January 1, 1958, experts may base their recognition of its safety either on scientific procedures or on experience based on common use in food. *See* 21 U.S.C. § 321(s); 21 C.F.R. § 573.30 (1979). The parties, both at

ed States v. Articles of Food and Drug Consisting of Coli-trol 80, . . . Enthrol-P, 518 F.2d 743, 746 (5th Cir. 1975). A review of the answers to interrogatories and affidavits discloses that genuine issues of material fact exist as to both.

In an effort to demonstrate the absence of a genuine issue of material fact as to the product's general reputation for safety among qualified experts, the government tendered affidavits from Dr. George T. Edds and Dr. Gary A. Van Gelder. Both affiants regarded the premix product as not having been proved safe and both opined that qualified experts do not regard the product as safe when used in poultry or animal feed. The government's answers to interrogatories listed five additional scientists or veterinarians who are of the opinion that the premix product is not generally recognized by qualified experts as safe for use in poultry feed. In opposition to the government's motion for summary judgment, Marshall submitted an affidavit from Dr. Roger D. Wyatt. Dr. Wyatt stated that he regarded the premix product as safe and opined that qualified experts consider the product safe when used in poultry or animal feed. In addition, Marshall's answers to interrogatories listed forty additional veterinarians or scientists who are of the opinion that the premix product is generally recognized as safe for use in poultry feed, thirty-eight of whom were acknowledged as holding this opinion in the government's answers to interrogatories.[9]

The government relied in part on the affidavits of Dr. Edds and Dr. Van Gelder to establish the absence of a genuine issue of material fact as to the foundation upon which to base a general reputation for safety. Both scientists stated their belief that

insufficient scientific data exist to indicate whether the use of gentian violet in poultry or animal feed premixes is safe. Indeed, Dr. Edds opined that the data that do exist suggest that gentian violet may be unsafe for use in poultry feed, noting that such data show that gentian violet is absorbed into the edible tissues of poultry, that gentian violet causes clastogenic and mutagenic effects in in vitro studies, and that gentian violet produces lesions that have been qualitatively interpreted in the direction of cancer. Moreover, both scientists disclaimed knowledge of any current textbook that advocates the use of gentian violet as a component of poultry feed and each affiant suggested that well controlled toxicity studies would be required before the use of gentian violet could be generally recognized as safe. Additionally, the government listed in its answers to interrogatories twenty-seven studies, investigations, scientific articles, and letters that are represented as being pertinent to the GRAS status of gentian violet. Thirteen of these are represented as indicating that the proposed use of gentian violet is not safe, three as indicating that the proposed use of gentian violet may cause cancer, and four as indicating that the use of gentian violet would cause mutagenic effects.

In opposing the government's position, Marshall initially relies on a casual reference in Wyatt's affidavit to a body of "scientific literature concerning Gentian Violet." When read in the context of Marshall's answers to interrogatories, however, that allusion suffices to disclose a genuine issue of material fact. Marshall listed in its answers to interrogatories twenty-three studies, investigations, and scientific articles that are represented as being pertinent

---

the district court and on appeal, concentrated on the former basis by demonstrating a body of scientific data and literature discussing the use of gentian violet as a component of poultry feed. We note, however, that Marshall's answers to the government's requests for admissions together with both parties' answers to interrogatories create a dispute over whether gentian violet was used as a mold and fungus inhibitor in poultry feed prior to January 1, 1958, and, if so, whether there exists an "expe-

rience based on common use in food" that supports the product's general recognition for safety among qualified experts. On remand, the district court must resolve this dispute.

9. The government's answers to interrogatories additionally listed two scientists not listed by Marshall who are of the opinion that gentian violet is safe when used as a component of poultry feed.

to the GRAS status of gentian violet. Nine of these are represented as carefully controlled investigations showing that the premix product is safe, three as articles demonstrating that gentian violet does not cause cancer when ingested by man or animal, and four as studies demonstrating that gentian violet does not cause mutagenic effects.[10]

We are aware, of course, of the government's long history of success in the various enforcement actions initiated by the FDA against individual gentian violet products and their manufacturers. *See United States v. Naremco, Inc.,* 553 F.2d 1138 (8th Cir. 1977); *United States v. 41 Cases, More or Less,* 420 F.2d 1126 (5th Cir. 1970); *United States v. 14 Cases, More or Less, . . . Naremco Medi-Matic Free Choice Poultry Formula,* 374 F.Supp. 922 (W.D.Mo.1974); *United States v. Articles of Food and Drug Coli-trol 80 Medicated,* 372 F.Supp. 915 (N.D.Ga.1974), *aff'd,* 518 F.2d 743 (5th Cir. 1975); *United States v. An Article of Drug . . . Entrol-C Medicated . . . ,* 362 F.Supp. 424 (S.D.Cal.1973), *aff'd,* 513 F.2d 1127 (9th Cir. 1975); *United States v. 7 Cartons, More or Less . . . "Ferro-Lac Swine Formula Concentrate (Medicated),"* 293 F.Supp. 660 (S.D.Ill.1968), *aff'd in part and vacated in part,* 424 F.2d 1364 (7th Cir. 1970). *See also United States v. Dan-Mar Enterprises, Inc.,* No. C78–08G (N.D.Ga. Sept. 21, 1978), *appeal dismissed,* No. 78–3666 (5th Cir. Jan. 22, 1979). We likewise are aware that the FDA recently denied Marshall's petition for a food additive regulation that would have permitted the marketing of the premix product. *See* 44 Fed.Reg. 19,035. *See also* note 2, *supra.* However, the government's record of successful enforcement proceedings and the denial by the FDA of Marshall's petition for a food additive regulation are without consequence in deciding whether the pleadings, depositions, answers to interrogatories, admissions, and affidavits filed in the present action create a genuine issue as to any material fact.

A court, in disposing of a motion for summary judgment, must determine whether a genuine issue as to any material fact exists. In so doing, it should not proceed to assess the probative value of any of the evidence presented in support of or in opposition to the motion. *Farbwerke Hoeschst A. G. v. M/V "Don Nicky,"* 589 F.2d 795, 798 (5th Cir. 1979); *Southern Distributing Co. v. Southdown, Inc.,* 574 F.2d 824, 826 (5th Cir. 1978). The district court erred by discounting the evidentiary value of Marshall's presentation on the issue of the absence of the product's general reputation for safety among qualified experts merely because thirty-eight of the forty-one veterinarians and scientists cited by Marshall as advocates of gentian violet's safety had been similarly listed by the unsuccessful claimant in *Dan-Mar Enterprises.* The district court similarly erred by discounting the evidentiary value of Marshall's presentation on the issue of the absence of a foundation upon which a general reputation may be based merely because the FDA, before denying Marshall's petition for a food additive regulation, reviewed at least half of the scientific studies cited by Marshall in the instant proceeding.

Because the district court erred when considering the motion for summary judgment by proceeding to assess the probative value of the parties' evidentiary presentations and because genuine issues of material fact exist that preclude summary judgment, we reverse the judgment appealed from and remand this action to the district court.

REVERSED and REMANDED.

---

**10.** Marshall's answers to interrogatories also listed various studies, investigations, and scientific articles that *support or contradict* the proposition that gentian violet is safe for use in poultry feed. Marshall also included studies, investigations, and articles that demonstrate that gentian violet *is or is not* absorbed by the poultry that consume it. The disjunctive nature of these answers makes a numerical analysis of that portion of the list impossible.

The government's answers to interrogatories listed one study that indicates the use of gentian violet is safe when used in poultry feed and a second study indicating that gentian violet does not cause cancer when ingested.