**UNITED STATES of America, Plaintiff,**

**v.**

**VITAL HEALTH PRODUCTS, LTD., a corporation, and Conrad E. LeBeau, an individual, Defendants.**

**No. 91–C–363.**

United States District Court,
E.D. Wisconsin.

March 10, 1992.

762

Stephen A. Ingraham, Asst. U.S. Atty., Milwaukee, Wis., Walter Stauffacher, Food & Drug Admin. Office of Gen. Counsel, Rockville, Md., Jay I. Bratt, Office of Consumer Litigation, U.S. Dept. of Justice, Washington, D.C., for U.S.

Wendy Alison Nora, Access Legal Services, Madison, Wis., for Vital Health Products, Ltd.

Conrad E. LeBeau, pro se.

## DECISION AND ORDER

WARREN, Senior District Judge.

Before the Court are the plaintiff's motions for summary judgment and dismissal of the defendant's counterclaim, as well as a host of non-dispositive motions brought by the defendant. Since the non-dispositive motions will become moot once the summary judgment motions are resolved, the Court shall not address them.

### I. BACKGROUND

A. VITAL HEALTH AND ITS PRODUCTS

Defendant Conrad LeBeau is a Wisconsin citizen who is engaged in the business of promoting hydrogen peroxide and other "natural remedies" as curative substances. He conducts his business as defendant Vi-

tal Health Products, Ltd. ("Vital Health"), a corporation over which he has complete control and is president. Vital Health sells and distributes 35% Hydrogen Peroxide, 17.5% Hydrogen Peroxide and Glycerin, Peroxy Gel, White Birch Mineral Water, Licorice Root Tea, and Lymph System, among other products. In addition, Mr. LeBeau is the author of a newsletter entitled "Vital Health News" ("News"), which is distributed by Vital Health Publications. News calls itself "a publication issued periodically to provide news and new developments in a wide range of health related areas including freedom of choice in medicine, holistic regimens, new health products and new uses for existing health supplements." News, Vol. 2, No. 1 at 2. It contains a warning that "[p]ersons with serious illness should seek the help of a medical professional and should not attempt self treatment solely on the basis of information contained in this newsletter." *Id.*

"35% Hydrogen Peroxide Solution" and "17.5% H202 and Glycerine" are liquid forms of hydrogen peroxide sold by Vital Health for ingestion. News describes the 35% solution as able to kill intestinal germs and bacteria on contact. The user is instructed to add 3 to 7 drops of the hydrogen peroxide to a glass of water and drink it on an empty stomach, and is warned that if excessive quantities are swallowed, blood sugar levels may be lowered, resulting in coma or death. News suggests keeping the 35% solution in the freezer, out of the reach of children. The label on the 4 ounce bottle has similar instructions and warnings, and instructs the user that the water/peroxide mixture may be taken every three hours. If intestinal gas occurs, the user is instructed to discontinue treatment. First aid procedures are listed for skin and eye contact as well as ingestion.[1]

News' paragraph on the 17.5% solution is shorter and merely describes it as a "no nausea formula," because it does not have an aftertaste or cause an upset stomach. The addition of glycerine slows the absorption of hydrogen peroxide into the bloodstream. Adults are instructed, by the labeling on the 4 ounce bottle, to add 7 to 14 drops of the solution to a glass of water and to take it on an empty stomach once a day. The warnings on the bottle are identical to those on the 35% solution, with one exception. The 17.5% solution's label warns, "Do not use for more than 10 days, except as directed by a doctor."

"Peroxy Gel" is a solution containing hydrogen peroxide, aloe vera, and glycerine, and is distributed for topical application. News endorses Peroxy Gel's healing powers by printing testimonials of parties who have used it to treat various ailments successfully. For example:

> Several people claim to have had complete relief from the pain of arthritis and rheumatism. It is effective when used on sore muscles, aching joints, fungal infections, athlete's foot, insect bites, burns and bruises. It has been reported effective against Lyme's disease. Recently, the owner of a health food store in Sonora, CA reportedly shrunk a large tumor with adhesions by applying Peroxy Gel directly on the tumor. The tumor, which was "the size of a hen's egg" shrunk to a "half-dollar" and "all the pain is gone." Also, in Scottsdale, AZ, a registered nurse who was told eight months ago by her doctor that she had terminal cancer of the pancreas and had three months to live, now claims to be in excellent health. She said all she did was rub ½ tablespoon of Peroxy Gel on her skin three times a day and ate a natural diet of raw vegetables and fruits and yogurt with some flax oil ... In Jan. 1990, she had a catscan and all they found was a small indentation in the pancreas, no cancer was detected.

News at 15. One teaspoon of Peroxy Gel provides the equivalent of 15 drops of 35% hydrogen peroxide. According to its label, it may be used for aching joints, back massage, athlete's foot, minor infections, sore muscles, burns, bruises, and insect bites. It claims to soothe and heal skin and lessen

---

1. The label reads, "Ingestion: Drink one pint or more of water." The Court assumes that this is the remedy for excessive consumption of hydrogen peroxide.

pain. In addition, it may be used on one's teeth and gums. However, the label warns the user to keep it away from the eyes and to discontinue its use if a rash occurs.

Other products sold by Vital Health include "Lymph System," "White Birch Mineral Water" ("White Birch"), and "Licorice Root Tea." White Birch is a "trace mineral supplement made from the ashes of white birch trees grown in northern Wisconsin ... [It] can be applied topically on the skin or can be mixed with water and taken internally." News at 16. News cites two priests as believing that White Birch caused patients in Michigan with cancer and arthritis to experience remissions, while a man in Texas claims that it cured his genital warts. Lymph System is not discussed in Volume 2, Issue 1 of News. However, the label on a bottle of Lymph System instructs that it should be used "for the detoxification and purification of the lymph system." The dosage is 10 to 15 drops mixed with a teaspoon of water, taken three or four times daily. In acute cases, a patient may take a dose every two hours. Children may take one half the recommended dosage for adults. Licorice Root Tea is described as useful in treating stomach ulcers, AIDS, cancer, candidiasis, chronic infection, and weakened immune systems.

Mr. LeBeau has testified that he is not a doctor, nor does he have an extensive background in chemistry or biology. Transcript at 18–19. From his testimony and writings, it appears that he gained his knowledge about the health properties of hydrogen peroxide and other Vital Health products from self-experimentation and word-of-mouth. Plaintiff's Exhibit 2 at 3, 9; Transcript at 21. Many customers who have used Peroxy Gel and other hydrogen peroxide products have written to this Court, thrilled with its benefits and claiming it has cured everything from athlete's foot to skin cancer.

Mr. LeBeau also distributes a booklet entitled "Hydrogen Peroxide Therapy," which consists of reprints of several articles, written by himself and other proponents of hydrogen peroxide treatments. The chapters are entitled "Hydrogen Peroxide Therapy—New Hope for Incurable Diseases," "Interferon Produces H202 (Pneumonia disappears in 24 Hours)," "Infusion Therapy," "Ozone Stops AIDS," and "How To Rebuild Your Immune System." On the front inside cover of the booklet is a notice which states, "The material in this book is for educational purposes only and is not intended as a prescription for any illness."

The booklet contains second hand claims about the healing powers of hydrogen peroxide. For example, Mr. LeBeau writes about a conversation he had with Walter Grotz, during which Mr. Grotz told him about a doctor in Mexico who treated cancer patients with intravenous doses of hydrogen peroxide. "A terminal patient with prostate cancer made a complete recovery in 2 weeks, returned to his home in Minnesota and went back to work." Plaintiff's Exhibit 2 at 5. There are claims that hydrogen peroxide can be used to cure or treat pneumonia, Downs Syndrome, emphysema, tumors, cancer and arthritis, and may also be used for treating sick pets. Chapter Four discusses the intravenous use of ozone for AIDS patients and suggests that similar results may be achieved by bathing in water mixed with hydrogen peroxide.

The booklet, as well as the newsletter mentioned earlier, are available through Vital Health Publications ("Publications"). Publications has a different location than Vital Health, and the two companies distribute their products separately. Mr. LeBeau created Publications after the government brought an action against him in 1989 for selling misbranded drugs. Publications' literature was held to constitute labeling and transformed the products into misbranded drugs by law. By shipping the literature and the products separately, Mr. LeBeau believes that he is in conformity with government regulations. Transcript of Preliminary Injunction Hearing (hereinafter "Transcript") at 16.

B. FEDERAL STATUTES RELEVANT TO VITAL HEALTH'S PRODUCTS

The Federal Food, Drug, and Cosmetic Act of 1938 ("the Act"), 21 U.S.C. § 301, *et*

*seq.,* was designed to protect public health by regulating certain products moving in interstate commerce. *United States v. Kordel,* 164 F.2d 913 (7th Cir.1947); *United States v. Two Bags, Poppy Seeds,* 147 F.2d 123 (6th Cir.1945); *Barnes v. United States,* 142 F.2d 648 (9th Cir.1944). One of the Act's primary purposes was to ensure the safety of food and drugs before they became available to the public. *United States v. Wiesenfeld Warehouse Co.,* 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964). Section 331 of the Act prohibits the introduction or delivery of a misbranded drug or an unapproved new drug through interstate commerce. 21 U.S.C. §§ 331(a) and (d).

A product is a "drug" for the purposes of the Act if it is "intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals." 21 U.S.C. § 321(g)(1)(B). A "new drug" is any drug that is "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the condition prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 321(p)(1). However, a "grandfather" clause exists in 21 U.S.C. § 321(p)(1) which exempts a drug from "new drug" status if it was subject to the Food and Drugs Act of 1906 and "its labeling contain[s] the same representations concerning the conditions of its use" as it did prior to the Act.

The manufacturer of a "new drug" has two recourses if he wishes to distribute his product in accordance with the Act. First, he may submit an application to the Secretary of Health, Education and Welfare which must contain:

(A) full reports of investigations which have been made to show whether or not such drug is safe for use and whether such drug is effective in use; (B) a full list of the articles used as components of such drug; (C) a full statement of the composition of such drug; (D) a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug; (E) such samples of such drug and of the articles used as components thereof as the Secretary may require; and (F) specimens of the labeling proposed to be used for such drug.

21 U.S.C. § 355(b). Once the application is filed, the Secretary will either approve the application or conduct a hearing on whether the drug should be approved. Grounds for refusing the application include a failure to adequately test the drug, failure to show that it is safe for the uses prescribed, and lack of evidence that the drug will do what it purports to be able to do. 21 U.S.C. § 355(d).

If the manufacturer does not wish to go through the trouble and expense of the application, he can claim that his product is not a "new drug" because it is "generally recognized among experts" as being "safe and effective" for its intended uses. 21 U.S.C. § 321(p)(1); *United States v. Articles of Drug,* 624 F.Supp. 776 (N.D.Ill. 1985). "Courts have construed 'general recognition' to require a consensus of expert opinion based on the same 'substantial evidence' of effectiveness based on 'adequate and well-controlled investigations' which would be required for approval of a new drug application under 21 U.S.C. § 355(d)." *United States v. Articles of Drug,* 624 F.Supp. at 778, citing *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973).

A drug may be termed "misbranded" if there are allegations that its labeling or advertising is misleading. Whether or not a label is misleading is a question of fact. *United States v. 47 Bottles, Jenasol RJ Formula '60',* 320 F.2d 564 (3rd Cir.1963). In determining whether the drug is actually misbranded, the factfinder may take into account both statements or representations made about the drug and the seller's failure to reveal material facts about consequences which may result from the use of the drug as labeled. 21 U.S.C. § 321(n). "Labeling" includes "all labels and other written, printed, or graphic matters (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m).

When the drug is a prescription drug, the labeling requirements are not as stringent, since prescription medicines are regulated by other sections of the Act. Title 21 U.S.C. § 353(b)(2) exempts prescription medications from the definition of "misbranded," because the burden of providing information to the customer has been shifted from the manufacturer to the prescribing physician. The drug companies provide information to the physician, who must then make the decision whether or not to prescribe the medicine, knowing the risks and benefits associated with it. *See United States v. Evers*, 643 F.2d 1043, 1052 (5th Cir.1981). However, even prescription drugs' labels must contain "directions for use and cautionary statements, if any, [must be] contained in such prescription." 21 U.S.C. § 353(b)(2).

## C. FACTUAL AND PROCEDURAL HISTORY

On March 14, 1988, James Roberts, director of the Minnesota District of the FDA, sent a warning letter to Mr. LeBeau. The letter explained that Mr. LeBeau's marketing of Aloe Vera Oxygel violated several sections of the Federal Food, Drug, and Cosmetic Act ("the Act"). The claims that Oxygel could be used to treat arthritis, cancer, and AIDS meant that it could be classified it as a "drug" under the Act. Because the "drug" was not tested and approved under the Act's guidelines, and adequate instructions were not given for its use, it was considered a "misbranded" drug and a "new drug." If LeBeau wished to continue with his business, he would have to comply with the Act's regulations in the future.

Apparently, Mr. LeBeau continued distributing his products in the same manner, despite these warnings. In 1989, the FDA filed a formal action in the Eastern District of Wisconsin seeking to seize a number of vials of hydrogen peroxide solution sold for ingestion by the defendant. The two parties eventually settled, with Mr. LeBeau agreeing to withdraw a claim he had filed against the FDA in exchange for the FDA's promise not to call the vials "misbranded drugs" in the settlement agreement. The FDA then confiscated the vials.

Mr. LeBeau continued to market and sell his products even after the FDA had seized the peroxide solution. Finally, the FDA filed a complaint against Mr. LeBeau and Vital Health on April 12, 1991, seeking to enjoin Mr. LeBeau and Vital Health from selling unapproved "new drugs" or "misbranded drugs" in interstate commerce. On that same date, the FDA also moved for a preliminary injunction which would restrict Mr. LeBeau and Vital Health from selling his products during the pendency of this action. On May 9, 1991, Mr. LeBeau answered both complaints *pro se* and filed a counterclaim as well as a demand for a jury trial.

The Court granted the plaintiff's motion for a preliminary injunction, largely due to the government's likelihood of success on the merits and the very real possibility that Mr. LeBeau would continue to market his products during the pendency of the case. Pursuant to the plaintiff's motions, the Court struck the jury demand, since the action was one in equity; there is no right to a jury trial in an action for purely injunctive relief. *United States v. Ellis Research Laboratories, Inc.*, 300 F.2d 550, 554 (7th Cir.1962). The Court also struck the answer and affirmative defenses filed on behalf of Vital Health, since a corporation may not proceed *pro se*. *Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1427 (7th Cir.1985).

However, the counterclaim filed by Mr. LeBeau is still pending, even though the government has since filed a motion to dismiss it. In essence, the counterclaim alleges that the FDA is turning a blind eye to drug manufacturers who do not warn consumers of all adverse effects of prescription drugs on the labels or packaging of those drugs. Mr. LeBeau has moved the Court for a mandatory injunction, causing the FDA to issue a regulatory letter which would compel all drug manufacturers "to provide for dispensation along with the prescription drug—literature that contains adequate warnings on adverse reactions, possible allergic reactions and reactions likely in certain pathological conditions as well as drug inter-reactions."

Counterclaim at 4. He contends that the Court has jurisdiction over his counterclaim pursuant to 42 U.S.C. § 1983, 21 U.S.C. §§ 352(f) and (j), and the First Amendment, "which allows citizens to petition their government for the redress of grievances." Counterclaim at 1.

On July 15, 1991, Attorney Wendy Allison Nora of Access Legal Services filed her appearance as attorney of record for Vital Health and answered the FDA's complaint. LeBeau continued to represent himself. The FDA filed its motion for summary judgment on August 16, 1991. LeBeau responded to the motion, then moved to stay the proceedings. At a final pretrial conference on September 16, 1991, the Court granted time extensions to the defendants, so that they might review and revise their pleadings, if necessary. The defendants filed additional objections to the plaintiff's motion for summary judgment on January 6, 1992, the deadline given by the Court in an earlier order. Part of the objection consisted of a motion to strike the affidavit of Gloria Troendle ("Troendle"), one of the FDA's experts.[2]

## II. STANDARD OF REVIEW AND LEGAL FRAMEWORK

A. SUMMARY JUDGMENT STANDARD

The standard for summary judgment was set forth by the Seventh Circuit in *Howland v. Kilquist*, 833 F.2d 639 (1987).
Fed.R.Civ.P. 56(c) provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When the facts are disputed, the parties must produce proper documentary evidence to support their contentions, and may not rest on mere allegations in the pleadings, *Posey v. Skyline Corp.*,

702 F.2d 102, 105 (7th Cir.1983), or upon conclusory statements in affidavits. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). In reviewing a grant of summary judgment, all reasonable inferences from the evidence presented must be drawn in favor of the opposing party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 [106 S.Ct. 1348, 1356, 89 L.Ed.2d 538] (1986) ... The mere existence of a factual dispute will not bar summary judgment unless "the disputed fact is outcome determinative under governing law." *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983) *(en banc)*.
*Id.* at 642.

The United States Supreme Court further clarified the scope of *Fed.R.Civ.P.* 56 in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) and *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Celotex*, the Court held that the initial burden is on the moving party to demonstrate "with or without affidavits" the absence of genuine issues of material fact and that judgment should be granted as a matter of law in the moving party's favor. *Id.* 477 U.S. at 323, 106 S.Ct. at 2552. Once the moving party has met its burden, the opposing party must "go beyond the pleadings" and designate specific facts to support of defend each element of the cause of action, showing there is a genuine issue for trial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

In *Anderson*, the Court stated that the presence of a genuine issue of fact is to be determined by the substantive law controlling that case or that issue. *Id.* 477 U.S. at 252, 106 S.Ct. at 2512. The Court added that for purposes of Rule 56, a genuine issue of material fact exists "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510. The evidence must be evaluated in the light most favorable to

---

**2.** The Order issued on December 12, 1991 specifically stated that the defendants must file all motions on or before January 6, 1992, and that the Court would not consider anything filed after this date. However, Mr. LeBeau filed an amended motion to strike Gloria Troendle's Affidavit on January 31, 1992. The Court has not relied upon this, or any other, untimely filing at all in today's decision.

the nonmovant in that all justifiable or reasonable inferences are to be drawn in its favor. *Id.* at 255, 106 S.Ct. at 2513.

### B. PERMANENT INJUNCTION

■ Ordinarily, a party attempting to permanently enjoin another from specific conduct has a heavy legal burden of proof. However, when the moving party is the government, and an injunction is authorized by a federal statute, the movant's burden is not as onerous. The government need only show that the defendant has violated the Act and that there is a reasonable chance of recurring violations. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); *United States v. Baxter Healthcare Corp.*, 712 F.Supp. 1352, 1355 (N.D.Ill.1989). A permanent injunction is an authorized remedy, pursuant to 21 U.S.C. § 332(a), for violations of the Act.

### III. ANALYSIS

### A. UNITED STATES' ACTION FOR PERMANENT INJUNCTION

■ Mr. LeBeau has taken issue with one of the plaintiff's most crucial pieces of evidence. He argues that the affidavit of Gloria Troendle, M.D., which contains assertions that Vital Health's products are not recognized as safe and effective for its intended purposes, should be stricken from the record. Dr. Troendle, who has had no formal training in hydrogen peroxide therapy, should not be permitted to give her opinion.

Dr. Troendle's affidavit is certainly damaging to the defendants' case, since it contains the following statements:

> 10. ... I do not recognize Vital Health's hydrogen peroxide, even in a diluted form, as safe and effective in preventing, treating, or curing ... any ... disease listed in Vital Health's promotional material. Further, it is my opinion that hydrogen peroxide is not recognized among qualified experts as safe and effective for these conditions or for any of the other conditions for which the product is promoted ...

> 11. ... [I]n my opinion, there is no scientific basis for believing that any product containing hydrogen peroxide is effective to cure, treat, and prevent the diseases for which these products are promoted....

These statements form the basis of the government's motion for summary judgment, since lack of recognition of the safety and effectiveness of drugs is one of the prerequisites for a violation of the Act.

Instead of attempting to strike Dr. Troendle's affidavit, the defendants would have fared better had they introduced their own expert affidavits which, presumably, would have contradicted the government's evidence and given rise to a material issue of fact. The defendants have set forth the names and abbreviated qualifications of several experts whom they would have called to testify at trial. However, the Court has no knowledge as to what those experts would have said.

The fact that Dr. Troendle has not had any training or experience working with hydrogen peroxide or ozone cannot automatically disqualify her as an expert. When she testifies that the claims made by the defendant are not generally accepted or credible, she is relying upon her experience as a physician. She is familiar with a broad variety of drugs and cures, and knows the quantum of evidence necessary to establish these drugs as "new," "unapproved," and "misbranded." Requiring a physician to be trained in the very field whose legitimacy he questions would be unreasonable. The Court finds that Dr. Troendle is competent, due to her education, training and experience, to render the opinions given in her affidavit.

■ The Court may also rely upon these opinions in ruling upon the government's motion for summary judgment. Because Dr. Troendle is an expert, she is qualified to give her opinion in an affidavit, provided that the opinion is based upon specific facts that are set forth in the affidavit. *Mid-State Fertilizer v. Exchange National Bank*, 877 F.2d 1333 (7th Cir.1989). In her affidavit, Dr. Troendle testified about the parameters under which she has evaluated

the safety and effectiveness of drugs and their labeling. She set forth the requirements for a new drug application. She indicated that anecdotal evidence about the effects of drugs was essentially meaningless when the drugs had not been tested under "rigorous scientific conditions." Troendle Aff. at ¶ 6. Finally, she reviewed Vital Health's literature and labels. Based upon this evidence, she reached her conclusions.

The defendants have submitted various articles and books written by proponents of hydrogen peroxide therapy, with which they purport to raise issues of fact. However, as the plaintiff has pointed out, these sources are hearsay. Contrary to Vital Health's assertions, Federal Rule of Evidence 803(18) does not render these documents admissible. Rule 803(18) provides that statements contained in learned treatises may be admitted as exceptions to hearsay when the treatise has been "established as a reliable authority by the testimony or admission of [a] witness or by other expert testimony or by judicial notice." Moreover, Rule 803(18) applies only to the extent that the treatise is either relied upon by an expert witness during direct examination or is used to impeach the expert during cross examination. The defendants in this case have not shown that these articles and books are considered to be reliable authorities, nor have the sources been used in conjunction with expert affidavits.[3]

### 1. UNAPPROVED NEW DRUGS

■ To prevail on its motion for summary judgment, the plaintiff must first demonstrate that the items mentioned in its complaint, including the hydrogen peroxide solutions, Peroxy Gel, and White Birch, are drugs. Then, it must prove the absence of a material issue of fact as to any of the following issues: (1) that the drugs are not generally recognized among the nation's experts as safe and effective for their in-

tended use; (2) that there is no "substantial evidence," as required by 21 U.S.C. § 355(d), showing that controlled studies have determined the drug's safety and effectiveness; or (3) that there is little or no scientific literature confirming an expert consensus as to the efficacy or safety of the drug. *United States v. Articles of Drug,* 624 F.Supp. 776, 779 (N.D.Ill.1985). A new combination of safe and effective drugs is considered a "new drug" for the purposes of the Act. *United States v. Articles of Food and Drug, etc.,* 518 F.2d 743 (5th Cir.1975).

■ Mr. LeBeau argues that the government is collaterally estopped from asserting that the 17.5% and 35% solutions are "unapproved new drugs" based upon the settlement agreement negotiated in his earlier encounter with the FDA. In *United States v. 120 Bottles, More or Less ... "Peroxy Gel,"* No. 89–C–136 (E.D.Wis.), when the government seized some of Vital Health's products pursuant to the Act, the parties stipulated to a dismissal of the action. Mr. LeBeau agreed to withdraw a motion he had made against the government in exchange for the deletion of the term "unapproved new drugs" from the settlement agreement. The agreement merely termed the products "misbranded drugs" and ordered their destruction.

In order to prevail on his defense of collateral estoppel, the defendant must prove that the issue raised by the plaintiff was the same issue raised in earlier litigation, the issue was actually litigated in the earlier case, determination of that issue was necessary to the decision, and the decision was final. *Continental Can Co., U.S.A. v. Marshall,* 603 F.2d 590, 595–96 (7th Cir.1979). The defendant is unable to meet this legal requirement. In the seizure and forfeiture action, the court's primary purpose was to destroy the offending drugs. To accomplish this, it had two stat-

---

**3.** It appears that the defendants attempted to impeach Dr. Troendle by asking her to admit that she had not read the books. However, Dr. Troendle did not indicate that the books were generally regarded as reliable authorities, and neither did the defendants. Therefore, even

though the defendants attempted to use the books in a situation analogous to cross-examination, their failure to establish the reliability of the books precludes their admission into evidence.

utory means at its disposal. The drugs could be forfeited if they were misbranded or if they were unapproved new drugs. Because the stipulation admitted that the drugs were misbranded, whether they were unapproved new drugs was an issue whose determination was not necessary to the decision. In addition, there was no evidence presented as to whether the drugs were new and unapproved, nor did the government waive its right to bring this claim again. It merely agreed to modify the language in a document which would have led to the same result had the modification not occurred. Therefore, there has been no conclusive determination as to Peroxy Gel's and the hydrogen peroxide solutions' status as unapproved new drugs; collateral estoppel does not bar this Court from making this determination itself.

■ During the preliminary injunction hearing, Mr. LeBeau conceded that hydrogen peroxide and Peroxy Gel are drugs. Transcript at 37. He claims that the government has not shown any evidence that White Birch, Licorice Root Tea, and Lymph System are drugs. Contrary to his assertion, the government has made a showing that, for the purposes of the Act, these three products are drugs. In literature written by Mr. LeBeau, the products are reported to possess certain curative properties. Vital Health's Objection to the motion for summary judgment provides:

> Vital Health News reported the claims of two priests and one other citizen that White Birch Mineral Water has been effective in treating arthritis, cancer, and genital warts. Vital Health News reported the claims of Laurence Badgley, M.D. with respect to the usefulness of Licorice Root Tea in treating stomach ulcers, AIDS, cancer, candidiasis, chronic infection, and weakened immune systems. Vital Health News states that Lymph System is to be used for the

detoxification and purification of lymphatic system. It states that lymphatic problems occur in HIV+ persons and persons afflicted with candidiasis.

Opposition Brief at 2–3. From the defendants' own description, these items are "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man," 21 U.S.C. § 321(g)(1)(B), and thus must be considered "drugs" under the Act.[4] The defendants have also admitted that no new drug approval applications have been filed with the FDA for any of their products.

■ Because the Court has concluded that the products at issue in this case are drugs, the burden now rests upon the government to show that they are also "unapproved new drugs" under the Act. Although the Act provides that a drug is a new drug unless it is "generally recognized ... as safe and effective for use under the condition prescribed," 21 U.S.C. § 321(p)(1), it does not define "general recognition." The Supreme Court has determined that "the statutory scheme and overriding purpose of the 1962 amendments [to the Act] compel the conclusion that the hurdle of 'general recognition' of effectiveness requires at least 'substantial evidence' of effectiveness for [a new drug application's] approval." Weinberger v. Hynson, Westcott & Dunning, 412 U.S. 609, 629, 93 S.Ct. 2469, 2483, 37 L.Ed.2d 207 (1973).[5] In order for a drug to achieve general recognition, there must be a showing that: (1) there is a general agreement among experts that the product is effective; and (2) that the expert consensus is based on "substantial evidence." United States v. An Article Of Drug Consisting of 4,680 Pails, 725 F.2d 976, 985 (5th Cir.1984). The "substantial evidence" standard, which is not as stringent as the "preponderant evidence" standard, takes into account the frequent differences of opinion that will arise in the

---

**4.** Because the Act looks to the purposes for which the products are sold, even seemingly ordinary items, such as honey and cigarettes, may be considered drugs if they are promoted under health claims. See e.g., United States v. 250 Jars, etc., of U.S. Fancy Pure Honey, 218 F.Supp. 208 (E.D.Mich.1963), aff'd 344 F.2d 288

(6th Cir.1965); United States v. 46 Cartons, etc., 113 F.Supp. 336 (D.C.N.J.1953).

**5.** In other words, the quantum of approval for a new drug is the same whether or not an application for approval is filed with the FDA.

area of drug testing and evaluation. To show substantial evidence, a drug's proponent should be able to point to "a responsible body of qualified opinion," as well as to studies which are "adequate and well-controlled, upon which qualified experts can reasonably conclude that the product is effective for its labeled indications." *Id.* (citations omitted).

From the facts presented, the Court concludes that Mr. LeBeau's products are new drugs. There is no evidence that controlled studies were conducted to determine the products' effects. Mr. LeBeau has testified that he did some experiments with hydrogen peroxide and yogurt, and that he provided the 35% and 17.5% solutions to customers for oral use only after they demanded it. Transcript at 21, 24. Selling these products to customers and relying upon their letters cannot constitute "adequate and well-controlled studies." Hydrogen peroxide was not administered to patients under constant and controlled conditions, and the alleged results of the products were not verified by any medical experts.

Nor is there evidence that there is a responsible body of qualified opinion about the benefits of oral ingestion of hydrogen peroxide. First of all, the defendants' presentation of evidence to this effect is woefully inadequate. Although the briefs refer to a computer printout with 156 reference to hydrogen peroxide, the printout is nowhere to be found in the record. The Court is unable to independently judge the weight and credibility of the evidence asserted. Mr. LeBeau's references to it are nothing but hearsay. In addition, the defendants' references to a book on hydrogen peroxide which was published in 1904 cannot raise an issue of fact in this case. The book is nearly a century old, and in any case, does not purport to describe theories that are generally recognized.[6]

In contrast, the government has introduced Dr. Troendle's affidavit. Dr. Troendle is qualified, as an expert, to testi-fy as to her opinions concerning the general recognition of hydrogen peroxide's use as described by Mr. LeBeau. She has given her opinion that it is not recognized as safe and effective in treating many of the conditions listed in Mr. LeBeau's literature, nor is there any scientific basis supporting Mr. LeBeau's conclusions. Her opinions are consistent with the defendants' admissible evidence in the case, including the pleadings. Mr. LeBeau's arguments focus on the facts that his products have been used safely and successfully for many different purposes. These factors are irrelevant under the Act if the products are unapproved new drugs, since "isolated case reports, random experience, and reports lacking the details which permit scientific evaluation will not be considered." 21 C.F.R. § 314.126(e).

The defendants have not rebutted this affidavit with any competent testimony from their own experts, choosing instead to impeach Dr. Troendle's methods and to rely upon articles written by proponents of hydrogen peroxide therapy. Dr. Troendle has admitted that she has not tested or observed the effects of hydrogen peroxide, has not published articles concerning the drugs at issue, and has not interviewed doctors or patients who have used hydrogen peroxide therapy. However, she had no responsibility to do these studies; she gave her opinion based upon the information made available to her. Since the government has met its initial burden of production, the defendants bear the burden of raising a genuine issue of fact that necessitates a trial through their pleadings, answers to interrogatories, affidavits, and admissions on file. Although they have attempted to impeach Dr. Troendle's expertise, they have not presented a factual basis which raises any question about the accuracy of her conclusions. There are no counter-affidavits from practitioners of hydrogen peroxide therapy or authors of the articles defendants seek to have admitted. The testimonials of Vital Health's custom-

6. There is no expert affidavit attached to the defendants' pleadings which describes the book as a treatise that is generally regarded as a reliable authority in the field of medicine or even modern hydrogen peroxide therapy. See Federal Rule of Evidence 803(18).

ers are not admissible as evidence in a summary judgment motion. Mr. LeBeau's affidavit consists largely of conclusions with no factual basis, which are similarly inadmissible. Those assertions that are admissible do not raise any material issues of fact sufficient to rebut the government's case. Therefore, the Court finds that the 35% and 17.5% hydrogen peroxide solutions, Peroxy Gel, White Birch Mineral Water, Lymph System, and Licorice Root Tea are unapproved new drugs whose production may be enjoined by the FDA.

## 2. GRANDFATHER CLAUSE

Mr. LeBeau next claims that his products are exempt from new drug status under the grandfather provision of 21 U.S.C. § 321(p)(1), which states that a drug is not a new drug "if at any time prior to the enactment of [the] Act [enacted June 25, 1938] it was subject to the Food and Drugs Act of June 30, 1906 ... and if at such time its labeling contained the same representations concerning the conditions of its use." To be exempt from the Act by virtue of this grandfather clause, the drug must meet four conditions:

(A) the drug must have been commercially used or sold in this country before 1962;

(B) it must not have been with the definition of a "new drug" in the 1938 Act;

(C) it must not have been covered by an effective new drug application; and

(D) it must *currently* be "intended solely for use under conditions" prescribed or recommended in its 1962 labeling.

*United States v. Articles of Drug: 5,906 Boxes*, 745 F.2d 105, 108 (1st Cir.1984). Since 1938, the Act has required that experts generally recognize the safety of a drug, while language concerning a drug's effectiveness was not added to the Act until 1962. Therefore, a manufacturer attempting to qualify his drug under the grandfather clause must show that his drug was generally recognized as safe prior to 1962 and need not demonstrate that it was effective. *Id.*

In applying for an exemption under the grandfather clause, the moving party bears the burden of proof as to each element. Moreover, because the clause is an exception to a comprehensive regulatory scheme which protects public safety, it must be strictly construed. *5,906 Boxes*, 745 F.2d at 113. Neither of the defendants has offered competent evidence which raises an issue of fact as to all four elements, and therefore, Vital Health's products are not exempt from new drug status.

Mr. LeBeau has argued that his products' ingredients, such as hydrogen peroxide, glycerin, and aloe vera, have been used for centuries to cure infections, burns, and dry skin. Once again, however, he offers no admissible evidence to support these conclusions. Even if the Court was to take judicial notice as to the medical properties of these substances, there is still no valid claim for exemption. The defendants have not raised issues of fact about whether their products were used or sold commercially before 1962, whether the products were recognized as safe for their proposed uses, and whether the products are intended for use under the same conditions as they were prior to 1962. Furthermore, there is no evidence that the products were used in the past for the same purposes that Mr. LeBeau has suggested in his advertising and labeling.

It appears that many of the ingredients in Vital Health's products may have been used and sold prior to 1962. However, Mr. LeBeau has not presented any evidence that the chemical equivalents of items such as Peroxy Gel, 17.5% hydrogen peroxide solution, and White Birch Mineral Water were commercially used or sold at that time. Even if the individual components of the drugs could have qualified for exemption under the grandfather clause, the defendants have not shown that the combinations are equal to the sum of their parts. Courts have held that a combination of approved drugs is a new drug for the purposes of the Act. *United States v. Articles of Food and Drug, Etc.*, 518 F.2d 743 (5th Cir.1975). Because there is nothing in the record indicating that Vital Health's drug combinations were commercially used or sold before 1962, these combinations are not exempt under the grandfather clause.

Insofar as 35% hydrogen peroxide solution is concerned, there is no competent evidence showing that it was commercially used or sold for internal use prior to 1962. The same is true for Lymph System and Licorice Root Tea. Therefore, the Court concludes that these products are subject to the Act as well.

### 3. MISBRANDED DRUGS

██ Whether a drug is "misbranded" pursuant to the Act is a question of fact which is best determined at trial. As discussed earlier, a drug is "misbranded" when its labeling or advertising is misleading. If the government is able to present factual evidence tending to prove that the Vital Health products were "misbranded drugs" and Mr. LeBeau or Vital Health are unable to dispute this evidence, then the Court may grant summary judgment for the government.[7]

██ The first issue is whether the literature distributed by Publications constitutes "labeling" for the purposes of the Act. The Supreme Court has held that even when literature on a drug's use is sent in a different package than the drug itself, the literature may still be a "label." *Kordel v. United States,* 335 U.S. 345, 69 S.Ct. 106, 93 L.Ed. 52 (1948). In *Kordel,* the petitioner was convicted under the criminal provisions of the Act for selling misbranded drugs. The pamphlets that he distributed in connection with his drugs were the only source of instruction to consumers. Both the drugs and the pamphlets were held to have had "a common origin and a common destination," and the Court held that the pamphlets were labeling. *Id.* at 348, 69 S.Ct. at 109.

In order to reach its conclusion that the drugs were misbranded, the Court had to find that the literature accompanied the drugs. It determined that "[o]ne article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill. No physical attachment ... is necessary." *Id.* at 350, 69 S.Ct. at 109–10. The fact that the literature was shipped separately was irrelevant, since the literature was clearly intended to be used to distribute and sell the drugs. *Id.* Finally, it held that the fact that the pamphlets had a selling price was immaterial, because the pamphlets and the drugs were interdependent and both parts of an "integrated distribution program." *Id.*[8]

Although not parallel, the facts in *Kordel* and this case are remarkably similar. Both defendants are "self-styled" authorities of the products they promote. Neither had any formal medical training. Both have sent literature and drugs to customers in separate packages. The customer need not purchase the defendant's drugs in order to buy his literature.

The two most notable differences between *Kordel* and the instant case are that Kordel was a criminal defendant and that he was charged with selling products that had no labeling other than what was contained in the literature. In contrast, Mr. LeBeau is a civil defendant in an action seeking to enjoin him from distributing his products. No criminal penalties have been sought. Furthermore, the products' containers are labeled with instructions for use and warnings of possible side effects.

Nevertheless, these distinctions do not negate the message of *Kordel.* Mr. LeBeau's newsletter and booklet discuss uses to which Peroxy Gel and hydrogen peroxide may be put and these uses do not appear on the packages' labels. For example, the label attached to the Peroxy Gel bottle does not suggest that the solution

---

7. Although whether the drugs were misbranded is a question of fact, the Court may dispose of this issue on summary judgment if neither party disputes the facts themselves. In this case, the focus is on whether written material constitutes "labeling" or "advertising," which presents a question of law. The interpretation of the facts, rather than the facts themselves, is in dispute. Therefore, this issue is amenable to summary disposition.

8. The Seventh Circuit Court of Appeals described "accompaniment" as a descriptive term pertaining to "a relationship between an article of drug and its labeling ... [One of] the usual characteristics of labeling is that of informing a purchaser of the uses of an article to which the labeling relates." *United States v. Kordel,* 164 F.2d 913, 915 (7th Cir.1947).

may be used to treat Downs Syndrome. Yet "Hydrogen Peroxide Therapy" reports that "a child with Downs Syndrome responded favorably after a small about [sic] of [a hydrogen peroxide based] gel was rubbed on the bottom of her feet for 2 months." Plaintiff's Exhibit 2 at 11. The booklet also recommends topically applying one tablespoon of a hydrogen peroxide/aloe vera juice solution to treat cancer.

Admittedly, many of the claims made about hydrogen peroxide's healing properties are made not by Mr. LeBeau, but by third parties whose letters and testimonials he cites. However, by including this information in his booklet and newsletters, Mr. LeBeau effectively endorses other potential uses for his products. When he describes a patient who cured her cancer by "following a vegetarian diet with lots of yogurt, using TriBalene 4 times a day ... and using ½ Tablespoon of a hydrogen peroxide based gel three times a day," it has the same effect as "prescribing" this treatment for any of his readers. Indeed, many of the letters sent to the Court by Mr. LeBeau's customers indicate that his products were used for ailments other than those listed on the packaging.

Apparently, Vital Health and Publications no longer distribute News or "Hydrogen Peroxide Therapy." However, on several occasions, Vital Health enclosed a leaflet with products it shipped, informing the purchaser that "Hydrogen Peroxide Therapy" could be ordered from Nutri Books in Denver, CO. Claflin Aff. at ¶ 5; Plaintiff's Exhibit 12. Although the relationship between the booklet and the actual drugs has become slightly more attenuated, the Court still finds that the core relationship is intact and that the two products are interdependent. Therefore, even though Vital Health technically does not sell "Hydrogen Peroxide Therapy," it is still distributing it in conjunction with its other products, which makes the booklet "labeling" under *Kordel.*

■ Since the Court has concluded that the booklets and the newsletters constitute labeling, it is now necessary to determine whether the drugs were misbranded. Although this issue was not reached by the Supreme Court in *Kordel,* the Seventh Circuit did address it in its holding.

The Seventh Circuit found that the public would be endangered by Kordel's misleading labeling. Although the products that he promoted were not inherently dangerous or toxic, there was the strong possibility that consumers who used his remedies would rely upon self-diagnosis instead of seeing a physician. *United States v. Kordel,* 164 F.2d at 916. In addition, "the literature encouraged people to experiment with themselves and that meant they were gambling with their health and life." *Id.* at 915–16.

In this case, Mr. LeBeau is promoting at least two products which present a clear danger to his customers. He has acknowledged that excessive ingestion of hydrogen peroxide can cause death, and that a bottle of it in the refrigerator can easily be mistaken for a glass of water. To his credit, his products and literature do contain warnings about excessive consumption and keeping the product out of a child's reach. However, as Dr. Sorrell Schwartz has pointed out, the directions for internal use of hydrogen peroxide are ambiguous. Schwartz Aff. at ¶ 12. For the 35% solution, the label recommends adding "3 to 7 drops to a glass of water." It also suggests that the dose may be repeated several times daily. No formula for diluting the solution is given. The Court finds that the products' instructions, as well as the literature, set forth so many different dosage levels that a consumer is likely to become confused and attempt to construct his own formula. If he takes the claims made in the literature at face value, it would not be difficult for him to reach a conclusion of "the more, the better."

The remainder of Vital Health's products named in the government's complaint are probably not inherently dangerous. The danger surrounding Peroxy Gel, Lymph System, White Birch Mineral Water, and Licorice Root Tea is the same danger that the Seventh Circuit described in *Kordel.* Customers may attempt to treat serious ailments themselves rather than seeing a

physician. The delay in seeking adequate medical treatment could harm the customer, and major medical consequences could arise from a relatively minor cause that would have been easily curable if the patient had gone to a professional at once. A non-prescription drug that meets the standards of the Act will have undergone a battery of tests and studies to ensure that it does what it purports to do. Mr. LeBeau has not presented scientific evidence showing that his products perform in the manners alleged in his publications. Although his customers have sent letters to him and to the Court that glow with praise, this is not substantial evidence under law; Mr. LeBeau needs to present more than mere anecdotal evidence from lay people that the drugs are not misbranded.

#### 4. THE NINTH AMENDMENT

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." In support of their objection to the plaintiff's summary judgment motion, the defendants have argued that the Ninth Amendment gives citizens the right to choose their own medical treatment.

Rather than enunciating a particular affirmative right, the Ninth Amendment serves to protect other fundamental rights that are not set forth in the Constitution. *Charles v. Brown*, 495 F.Supp. 862, 863 (N.D.Ala.1980). Some unenumerated rights may be of Constitutional magnitude, but only by virtue of other amendments, such as the Fifth or Fourteenth Amendment. A person cannot claim a right that exists solely under the Ninth Amendment. *Id.* at 864.

In *Andrews v. Ballard*, 498 F.Supp. 1038 (S.D.Tex.1980), to which the defendants cite in support of their defense, the district court concluded that "the decision to obtain or reject medical treatment ... is both personal and important enough to be encompassed by the right of privacy." *Id.* at 1048. Therefore, articles and rules that limited the practice of acupuncture in Texas deprived citizens of the right to obtain acupuncture treatment and violated their right to privacy. *Id.* at 1057. Nevertheless, the *Anderson* court balanced the individual's right to medical treatment with the State's interest in preserving the health of the patient, and found that the State could have accomplished its goal by less drastic means. *Id.*

In *Anderson*, the court found that the right to obtain and reject medical treatment was grounded in the "liberty" aspect of the Fourteenth Amendment, which formed the basis for an individual's right to privacy. Assuming that the defendants in this case had even asserted a Fifth or Fourteenth Amendment defense, which they did not, their right to privacy would still not be implicated by the government's action. There are cases where "the government's interest in protecting the health of its citizens often overrides a patient's choice of a particular treatment or medication." *Jacob v. Curt*, 721 F.Supp. 1536, 1539 (D.R.I. 1989). For instance, when cancer patients sought to enjoin the government from interfering with the interstate shipment of Laetrile, the Tenth Circuit noted that the patients' right of privacy could not override the fact that Laetrile might have been a new drug.

> "It is apparent in the context with which we are here concerned that the decision by the patient whether to have a treatment or not is a protected right, but his selection of a particular treatment, or at least a medication, is within the area of governmental interest in protecting public health."

*Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir.1980). Even under the string of Supreme Court cases which have held that individuals have various rights of privacy, Congress still has the authority to limit a patient's *choice* of medication. *Id.*

Therefore, a claim that American citizens have the freedom to choose whatever medication or treatment they desire is not grounded in the Fifth, Ninth or Fourteenth Amendment. The defendants have asserted only the Ninth Amendment, which is not a source of substantive rights unless it is coupled with the denial of a fundamental right. *See e.g., United States v.*

*Choate*, 576 F.2d 165, 181 (9th Cir.1978). Because the right to receive any medicine or treatment is not a constitutional right under the Fourteenth Amendment's right to privacy, the defendants' Ninth Amendment defense must be overruled. *See Charles v. Brown*, 495 F.Supp. at 864 ("a ... claim based solely on alleged Ninth Amendment rights must fail because there are no constitutional rights secured by that amendment.").

 Since the Court has found that Vital Health's products are unapproved new drugs and misbranded drugs, and has rejected the defendants' Ninth Amendment defense, it must determine whether there is a risk that the defendants will continue to manufacture and promote their products in spite of the Act's restrictions. It finds that there is a reasonable chance that the defendants will continue to do so unless they are permanently enjoined. Mr. LeBeau was already the subject of a civil forfeiture action with respect to another substance, Oxygel, which was found to be a misbranded drug. In addition, he has received warning letters from the FDA which apprised him of the government's suspicions that Vital Health's products contravened the Act. The only changes he has made in his behavior were thinly veiled attempts to circumvent the specific language of the Act; in particular, he has argued that his products are not misbranded by virtue of the claims in "Hydrogen Peroxide Therapy," because Vital Health and News no longer sell this booklet. While this may be true, Mr. LeBeau is the author of the booklet and advertises it with shipments of Vital Health's products. This type of behavior, as well as his insistence on distributing his products in the face of impending litigation and his misapprehension of his rights under the Ninth Amendment, have led this Court to conclude that a permanent injunction is the only means by which Mr. LeBeau and Vital Health can conform their conduct to that required by the Act. Therefore, the government's motion for summary judgment shall be granted.

**9.** In addition, 42 U.S.C. § 1983 is meant to be

## B. MR. LeBEAU'S COUNTERCLAIM

In his counterclaim, Mr. LeBeau has sought an injunction against the government. He states that the FDA does not protect consumers from drug manufacturers who conceal the side effects of drugs and do not inform the public about potentially harmful combinations of otherwise safe medications. According to him, this Court has jurisdiction over his counterclaim pursuant to 42 U.S.C. § 1983, 21 U.S.C. §§ 352(f) and (j), and the First Amendment.

The government has moved to dismiss the counterclaim on several grounds. First, it contends that the Court lacks jurisdiction under 42 U.S.C. § 1983, since this is an action against a federal, not state, agency. In addition, section 1983 actions are based upon constitutional violations, and in this case, there have been no violations of the Ninth Amendment. Likewise, the government argues that the First Amendment right "to petition the Government for a redress of grievances" does not grant the defendants the substantive rights that they have claimed. Finally, the government refutes the crux of the defendants' counterclaim by averring that the FDA does enforce the Act with respect to labeling requirements for prescription drugs.

 Title 42 U.S.C. § 1983 provides legal or equitable recourse to persons who have been deprived of their constitutional rights by the actions of another person acting under state color. In this case, it is asserted as a cause of action against the United States. The United States, however, is not a "person" under 42 U.S.C. § 1983. *Accardi v. United States*, 435 F.2d 1239, 1241 (3rd Cir.1970), citing *Egan v. City of Aurora*, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961). Moreover, the United States may not be sued without its consent. *Ickes, Secretary of the Interior v. Fox, et al.*, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525 (1937). Therefore, Mr. LeBeau has not stated a claim for which relief may be granted, and the Court must dismiss his counterclaim insofar as it relies upon 42 U.S.C. § 1983.[9]

used by people whose constitutional rights have

Similarly, the claims under 21 U.S.C. §§ 352(f) and (j) must be dismissed as well. Prescription drugs are exempted from the labeling requirements of 21 U.S.C. § 353(b)(2). In this manner, prescribing physicians may tailor their warnings to patients so that the patients' specific medical and safety concerns may be addressed. *United States v. Evers,* 643 F.2d 1043, 1052 (5th Cir.1981). The FDA is not failing to comply with the Act in this respect, since prescription drugs are exempt from the stringent labeling requirements of §§ 352(f) and (j).

▮ As for the First Amendment portion of Mr. LeBeau's claim, the Court finds that this does not consist of an adequate cause of action for his counterclaim. Mr. LeBeau may petition the government for any redress of grievances to his heart's content. However, this does not preclude the government from moving to dismiss any groundless causes of action he may present. Because Mr. LeBeau has not been able to state a claim under which he could be afforded relief, the government's motion to dismiss shall be granted.

## IV. CONCLUSION

Based upon the reasons set forth herein, the Court GRANTS the plaintiff's motion for summary judgment and DISMISSES defendant Conrad LeBeau's counterclaim. The plaintiff's prayer for a permanent injunction is GRANTED. It is further ORDERED that:

1. The defendants, and each of their agents, distributors, representatives, employees, attorneys, successors and assigns, and all persons in active concert or participation with them, who have received actual notice of this Order by personal service or otherwise, are hereby permanently restrained and enjoined from directly or indirectly doing or causing to be done any of the following acts:

A. Manufacturing, packaging, or distributing "35% Hydrogen Peroxide Solu-

tions," "Peroxy Gel," "17.5% Hydrogen Peroxide and Glycerine," "Lymph System," "White Birch Mineral Water," "Licorice Root Tea," any products containing hydrogen peroxide in any form, or any products having or purporting to have a similar composition, appearance, name, or intended use to any of the foregoing, unless and until: 1) an approved new drug application filed pursuant to 21 U.S.C. § 355(b) is in effect for such product; or 2) an effective notice of claimed investigation exemption filed pursuant to 21 U.S.C. § 355(i) and 21 C.F.R. Part 312 is on file for such product; or 3) the FDA has advised defendants in writing that such product is not misbranded and is not a "new drug" and that the manufacturing, packaging, and distributing of such drug does not otherwise violate the Act; and

B. Promoting, labeling, advertising, or representing that any of the foregoing products, or any products having or purporting to have a similar composition, appearance, name or intended use, or any other product constituting a drug under 21 U.S.C. § 321(g), is safe and effective in the cure, mitigation, treatment, or prevention of human disease, unless and until an approved new drug application authorizing such representations is in effect for such product, as required by 21 U.S.C. § 355(a).

2. Duly authorized representatives of the FDA are authorized, as FDA deems necessary, to make inspections of defendants' facilities, and all equipment, finished and unfinished materials and products, containers, labeling, and other promotional material therein, to take photographs, and to examine and copy all records relating to the manufacturing, packing, labeling, promotion, and distribution of any of defendants' products in order to ensure continuing compliance with the terms of this Order. Such inspections shall be authorized upon presentation of a copy of this Order and appropriate credentials. Such inspection authority granted by this Order is

been violated. As discussed elsewhere in this order, the Ninth and Fifth Amendments do not provide the right to any medical treatment, but only the right to choose between certain avail-

able medical treatments. Therefore, Mr. Le-Beau does not have a claim of constitutional magnitude and thus cannot seek a remedy under § 1983.

780

apart from, and in addition to, the authority to make inspections under the Act, 21 U.S.C. § 374.

3. The defendants shall reimburse the FDA for the costs of all FDA inspections, supervision, analyses, and examinations that FDA deems are necessary to evaluate the defendants' compliance with this Order, as follows: at the rate of $42 per hour or fraction thereof per representative for inspection work; $50 per hour or fraction thereof per representative for analytical work; 24 cents per mile for travel expenses; and $82 per day for subsistence expenses. In addition, if the defendants violate this Order and are found in civil or criminal contempt thereof, the defendants shall, in addition to other remedies, reimburse the plaintiff for its attorneys' fees, investigation expenses, and court costs relating to any contempt proceedings.

4. Within ten (10) days of the date of entry of this Order, the defendants shall serve a copy hereof upon each of their agents, representatives, distributors, employees, attorneys, successors and assigns, and upon all persons in active concert or participation with them.

5. The defendants shall notify, by letter, their agents, distributors, customers, and all other persons who, between May 1988 and the date of this Order, were involved in the sale or purchase of any Vital Health products that have been promoted by defendants for use in the diagnosis, cure, mitigation, treatment or prevention of any human disease, that pursuant to an order of this Court the products may no longer be distributed because they are misbranded and unapproved new drugs and that any continued distribution of these products is a violation of the Act, 21 U.S.C. § 301 *et seq.* This letter must be submitted to and approved, in writing, by the FDA District Director, Minneapolis, Minnesota, prior to its distribution. The Letter must be submitted to the FDA District Director within ten (10) days of the date of this Order.

6. Within thirty (30) days of the date of entry of this Order, defendants shall provide to the FDA District Director, Minne-apolis District Office, 240 Hennepin Avenue, Minneapolis, Minnesota 55401, and to plaintiff's attorneys, an affidavit identifying the names and positions of all persons notified pursuant to paragraphs 4 and 5. This affidavit shall include a copy of all letters sent evidencing the defendants' compliance with paragraph 5 of this Order.

7. The defendants shall, in writing, notify the FDA District Director, Minneapolis District Office, at least ten (10) days before any change in ownership, character, or name of their business, including reorganization, assignment, or sale resulting in the emergence of a successor business or corporation, or any other change in the structure or identity of Vital Health Products, LTD., or the sale or assignment of any business assets, such as buildings, equipment, or inventory that may affect oblations arising out of this Order. The defendants shall serve a copy of this Order on any prospective successor or assign within ten (10) days prior to such sale or change in business, and shall furnish plaintiff with an affidavit of compliance with this paragraph within fifteen (15) days of such sale or change in business. As noted in paragraph 1, this Order shall apply to all of the defendants' successors and assigns.

8. This Court retains jurisdiction over this action and the parties hereto for the purpose of enforcing and modifying this Order and for the purpose of granting such additional relief as may be hereafter necessary or appropriate.

9. Each party to this action shall be responsible for its own costs.

SO ORDERED.